2012 VT 100

# In re C.P., Juvenile

[71 A.3d 1142]

Nos. 12-057 & 12-191

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed December 7, 2012

*Allison N. Fulcher* of *Martin & Associates*, Barre, for Appellant Mother.

*Michael Rose*, St. Albans, for Appellant Father.

*William H. Sorrell*, Attorney General, and *Martha E. Csala*, Assistant Attorney General, Montpelier, for Appellee.

*Jill Jourdan* and *Julianne Woolard* of *Willey & Power*, Newport, for Juvenile.

¶ 1. **Dooley, J.** This decision resolves two consolidated appeals related to family division proceedings involving juvenile C.P. First, mother and father appeal termination of their parental rights to their son C.P., born in November 2009. Father argues that the court lacked subject matter jurisdiction to adjudicate the termination proceeding. Mother joins father's jurisdictional argument and also contends that the evidence and findings do not support the conclusion that termination is in C.P.'s best interests. Second, father challenges the court's post-termination order striking a sentence of the termination decision, and finding that the Department for Children and Families (DCF) made reasonable efforts toward achieving the permanency plan goal of reunifying C.P. with his parents. We affirm.

¶ 2. C.P. was born in Plattsburgh, New York, which is about twenty miles south of Mooers, the rural community in New York state where mother and father live. Mother and father reside at father's mother's home with several adult family members, all of whom are disabled to some degree and one of whom has a history of sexually abusing others. Mother was known to the New York Department of Social Services (DSS) prior to C.P.'s birth because

she has some emotional dysregulation and receives adult protective services. During mother's pregnancy, DSS employees observed mother having an emotional meltdown. DSS then worked with mother to develop a safety plan to be implemented following the baby's birth. The plan required father's mother to provide supervision for mother and baby and precluded mother from being left alone with the baby. The plan was imposed following C.P.'s birth. On April 19, 2010, an altercation occurred between mother and father's mother, and the police responded. Father's family reported that mother had grabbed C.P.'s arm and had covered C.P.'s mouth with hers to stop him from crying.

¶ 3. Mother left that home and initially went to stay with her mother, but she was unable to remain there. Because mother could not care for the baby on her own, DSS sought a placement for C.P. DSS contacted mother's sister in Morgan, Vermont, and she agreed to take in both mother and C.P. On April 21, C.P.'s aunt traveled to New York and signed an agreement, which explained that because mother could become easily frustrated and anxious with the baby, she could not be left as the sole caretaker of C.P. The aunt, C.P., and mother then returned to Vermont with the intent that the child would reside indefinitely in the aunt's home. During mother's stay, C.P.'s aunt observed that mother was unwilling to attend to C.P. and focused more on reestablishing her relationship with father. C.P.'s aunt and her teenage daughter took care of C.P., changing his diapers and feeding him.

¶ 4. On April 24, the aunt learned that father and his mother planned to pick up mother and take her back to father's mother's home in New York. Apparently, mother and the aunt were not getting along. When father arrived, the aunt told father to take mother, but that based on her understanding of the agreement she had signed with DSS, she could not let father take C.P. The aunt called Vermont DCF, and the DCF investigator spoke to both mother and the aunt. When the DCF investigator came to the house, mother was already gone, but C.P. remained. On April 26, DCF filed a petition for custody and an emergency care order, which was granted based on mother's abandonment of C.P. At the temporary care hearing a couple of days later, the court established father's paternity of C.P., continued DCF custody and granted parents visitation.

¶ 5. DCF filed a petition alleging that C.P. was a child in need of care or supervision (CHINS) based on two grounds — mother's

abandonment of C.P. and her failure to provide parental care. In October 2010, mother stipulated that C.P. was CHINS because she had not arranged for proper medical care when she left C.P. with his aunt. The preliminary case plan set concurrent goals of reunification and adoption. It called for mother and father to find appropriate work, to visit C.P. regularly, to work with a parent educator, and to obtain mental health counseling. A disposition report filed in November 2010 recommended termination of the parental rights of both the mother and father. DCF followed up with a formal petition to terminate in the disposition order.

¶ 6. During the period leading up to the disposition hearing, visits between parents and C.P. took place in Newport, Vermont, which is 90 to 110 miles from where parents live — about a two-hour drive. Initially, the visits were scheduled for an hour twice a week, but due to parents' unreliable transportation and difficulty finding a supervisor, the visits were changed to two hours once a week. Parents had problems securing transportation to the visits and missed 41% of their visits between July 2010 and July 2011.

¶ 7. A developmental assessment of C.P. was conducted in May 2010. It concluded that C.P. had delayed physical development. Within three weeks of being at the aunt's house, he made three months' worth of progress. By a year later, a similar assessment indicated that C.P. was developing normally, except for speech and language difficulties that were being addressed.

¶ 8. A forensic psychologist evaluated mother and father in the spring of 2011. The psychologist concluded that mother "would not be able to adapt her mode of parenting as the child grew" and "would find it difficult to take the negative 'feedback' an unhappy child would express, and that she would require a substantial degree of external support." The psychologist concluded that mother and father would both need assistance in completing daily skills and would need to be monitored. The psychologist determined that father could not successfully care for C.P. without "substantial supports."

¶ 9. The court held a disposition/termination hearing over two days in August and September 2011. At the hearing, testimony was presented by the DSS case worker, C.P.'s aunt and uncle, father's mother, a parent educator, mother and father. In addition, the court received deposition testimony from the forensic psychologist.

¶ 10. Based on the evidence, the trial court concluded that termination of parental rights was in C.P.'s best interests. The court examined the statutory best-interests factors, including C.P.'s relationship with parents and caregivers, C.P.'s adjustment to his current situation, the role parents play in C.P.'s life and the likelihood parents will be able to resume parenting within a reasonable period of time. See 33 V.S.A. § 5114 (listing best-interests factors). The court found that C.P. has a close bond with his foster family, particularly his aunt and teenage cousin. In contrast, the court found that C.P. does not have a strong relationship with his parents and sees them "as strangers." C.P. is well adjusted to his current home and would need "very competent and supportive parenting" to adapt to a new family without substantial harm. C.P.'s parents love him, but do not play a constructive role in his life. Finally, parents will not be able to resume parental duties within a reasonable period of time. The court explained that although mother had made some personal strides forward, her relationship with C.P. has suffered and parents lack a suitable home for C.P. Thus, the court granted termination of the parental rights of both mother and father on January 5, 2012.

¶ 11. The court's order also stated "This Court does not find that DCF used reasonable efforts to reunify [C.P.] with his parents. If the Department wishes further hearing on this issue it may so request." On February 17, 2012, DCF moved for an additional hearing. The court discussed the matter at a February 27 permanency planning review and again on April 9, 2012. No additional evidence was taken on the matter. On April 27, 2012, the court issued an order, finding based on the evidence submitted during the termination hearing that DCF had made reasonable efforts to finalize a concurrent permanency plan for C.P. As to the efforts to reunify C.P. with his parents, the court listed the following acts by DCF: facilitating parent-child contact, providing parents with a parent educator, completing an assessment of C.P. for developmental delays, having an interstate home study of parents' home in New York completed and making referrals for mental health treatment for both parents. The court also noted the efforts DCF made toward achieving adoption. The court struck the sentence from its prior order regarding the lack of reasonable efforts.

¶ 12. Both parents appeal the termination decision. On appeal, parents argue that the court lacked jurisdiction and the case

should be remanded for New York to assume jurisdiction. Mother argues that the evidence and findings do not support the court's best-interests analysis. Father also appeals the court's order concluding that DCF made reasonable efforts to finalize a permanency plan. Father contends that the trial court lacked jurisdiction to modify its termination order and that the subsequent decision regarding DCF's reasonable efforts served to emphasize that termination was due to factors beyond parents' control.

¶ 13. We first address the parties' challenge to the court's jurisdiction to adjudicate the proceedings in this case. The Uniform Child Custody Jurisdiction Act (UCCJA), 15 V.S.A. §§ 1031-1051,[1] dictates when "[a] court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination." *Id.* § 1032(a); see *In re B.C.*, 169 Vt. 1, 4, 726 A.2d 45, 48 (1999) (recognizing that "CHINS and TPR proceedings are subject to the Uniform Child Custody Jurisdiction Act (UCCJA)"). Under the UCCJA, jurisdiction is established if (1) Vermont is the child's home state; (2) it is in the child's best interests for Vermont to assume jurisdiction because the child and at least one parent have a significant connection to Vermont and substantial evidence is present here; (3) the child is physically present in Vermont and has been abandoned or requires emergency protection from mistreatment, abuse or neglect; or (4) no other state has jurisdiction or another state has declined jurisdiction, and it is in the best interest of the child that Vermont exercise jurisdiction. 15 V.S.A. § 1032. Jurisdiction is a question of law that we review de novo. *In re R.W.*, 2011 VT 124, ¶ 34.

¶ 14. Some factual background is necessary to understand this issue fully. Father's attorney first raised jurisdiction at the temporary care hearing in April 2010, explaining that parents and child were most connected to New York State, but conceding that the court had emergency jurisdiction. At the CHINS merits

[1] The order terminating the parental rights of both parents to C.P. was entered on January 5, 2012. The UCCJA was, by that time, repealed and replaced with the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), 15 V.S.A. §§ 1061-1096, which came into effect on July 1, 2011. See *id.* § 1096. However, under § 1096, a "motion or other request for relief made in a child custody proceeding . . . which was commenced before the effective date of this chapter is governed by the law in effect at the time the motion or other request was made." As discussed in the text, *infra*, the proceeding — however defined — was commenced before July 1, 2011. As a result, the UCCJA governs this case. See *In re R.W.*, 2011 VT 124, ¶ 57 n.13, 191 Vt. 108, 39 A.3d 682 (Dooley, J., concurring).

hearing in October 2010, father's attorney again conceded emergency jurisdiction under the UCCJA, but objected to the court issuing a disposition order. The court invited counsel to file a motion. No motion was filed before the court found C.P. was CHINS based on mother's stipulation on October 15, 2010, almost six months after C.P. arrived in Vermont. In November 2010, at a hearing, father's counsel reiterated that she felt the court lacked jurisdiction to issue a disposition order. There was some discussion of the issue on the record, and the court instructed the parties to file any motions concerning UCCJA jurisdiction within two weeks. Again, no motion was filed. All parties were present and represented at the termination hearing, and no party objected on jurisdictional grounds.

¶ 15. In its termination order, the court examined the proceeding's jurisdictional basis. The court found that Vermont's initial jurisdiction was based on the emergency provisions of the UCCJA. 15 V.S.A. § 1032(a)(3) (providing for jurisdiction when child is physically present in state and child has been abandoned or subjected to or threatened with mistreatment or abuse). The court explained that at the initial stage no other basis applied because neither C.P. nor parents had lived in Vermont or had any connection to Vermont. The court concluded, however, that this basis for jurisdiction was "ill-conceived," because there was little evidence of neglect or abandonment. Therefore, the court noted that the case "should have been pursued in New York." Nonetheless, the court concluded that there were insufficient grounds to dismiss the case for five reasons: (1) the court had subject matter jurisdiction generally over the type of proceeding; (2) Vermont was C.P.'s home state by the time the initial disposition requesting termination was filed in November 2010; (3) at the time of the termination petition C.P. had a significant connection to Vermont and much of the evidence concerning him was in Vermont; (4) New York DSS had worked with Vermont authorities on C.P.'s case and had not initiated proceedings regarding C.P. in New York; and (5) the parents failed to appeal the CHINS decision, which became a final judgment.

¶ 16. On appeal, father and mother now contend that the court lacked subject matter jurisdiction. They argue that Vermont lacked emergency jurisdiction over C.P. initially because C.P. and his parents had no connection to the state and there was no compelling evidence of abuse, neglect or abandonment. Therefore,

they claim that there was no jurisdiction to enter the CHINS order. Parents contend further that Vermont did not become C.P.'s home state by the time the initial disposition was filed because an erroneous assumption of jurisdiction cannot be cured by an erroneous retention of jurisdiction.

¶ 17. As explained in detail below, we conclude that parents' attempts to collaterally challenge the CHINS order is unavailing and that the court had jurisdiction at the termination stage. This case is substantially controlled by *In re B.C.*, 169 Vt. 1, 726 A.2d 45 (1999). See also *In re R.W.*, 2011 VT 124, ¶ 13. In *In re B.C.*, the juvenile's mother and grandmother appealed a termination decision, arguing that the family court did not have jurisdiction over the proceeding because the juvenile had been in Vermont for only two months prior to the filing of the underlying CHINS petition. 169 Vt. at 4, 726 A.2d at 48. The mother and grand-mother did not challenge Vermont's jurisdiction until after the CHINS determination was final and a termination petition was pending. They argued that while there may have been temporary emergency jurisdiction, the court lacked authority to make per-manent custody decisions. This Court held that there was home-state jurisdiction by the time the termination petition was filed. *Id.* at 5, 726 A.2d at 49. As to the CHINS and disposition orders, we explained that because the mother had failed to appeal she could prevail only if those orders were void under Rule of Civil Procedure 60(b)(4). *Id.* at 7, 726 A.2d at 50. Because the court had subject matter jurisdiction "over the general type of controversy before it," the resulting judgments were not void even if jurisdic-tion was erroneously exercised in the particular case. *Id.* We noted that this was in keeping with the policy behind the UCCJA because "[a]utomatically voiding prior judgments stemming from an erroneous exercise of jurisdiction under the UCCJA not only would undermine the principle of finality, but would permit litigants to contest the merits of a controversy in a convenient forum while reserving the 'jurisdictional card' in the event of an unfavorable decision." *Id.* at 8, 726 A.2d at 50.

¶ 18. The CHINS merits decision in this case is similarly final and not void pursuant to a belated collateral attack. See *Peery v. Super. Ct.*, 219 Cal. Rptr. 882, 886 (Ct. App. 1985) (explaining that normally a party is barred from collaterally attacking final judgment on jurisdictional grounds unless "the exercise of jurisdiction constitutes a manifest abuse of authority").

As explained in *In re B.C.*, when a party seeks to void a judgment after it is final the party must "satisfy the criteria for obtaining relief from a final judgment." 169 Vt. at 7, 726 A.2d at 50 (citing V.R.C.P. 60(b)(4)). A challenge made on subject matter grounds must show that the court lacked jurisdiction over the general category of case. "[W]hen a court has jurisdiction over a general category of case, the fact that the court errs in exercising its jurisdiction in a particular case within that general category 'is generally not sufficient to make the resulting judgment void for lack of subject-matter jurisdiction.'" *Id.* (quoting 12 J. Moore et al., Moore's Federal Practice § 60.44[2][b], at 60-142 (3d ed. 1998)).

¶ 19. Here, the court had jurisdiction over the child-neglect proceeding — the general type of controversy. 33 V.S.A. § 5103(a) (granting family division jurisdiction over CHINS proceedings). In addition, the family court has the ability to issue a CHINS decision pursuant to UCCJA emergency jurisdiction. *In re B.C.*, 169 Vt. at 6, 726 A.2d at 49-50; see *In re D.T.*, 170 Vt. 148, 156, 743 A.2d 1077, 1083 (1999) (clarifying *In re B.C.* and explaining that CHINS is not a permanent order and therefore can be made pursuant to temporary emergency jurisdiction). Thus, even if, as the termination court concluded, the exercise of emergency jurisdiction in this particular case was "ill-advised," in the context of this collateral attack, the underlying order is not void as a matter of law on subject-matter-jurisdiction grounds.

¶ 20. Father contends that the proceedings should have been commenced in New York where C.P. had lived until a few days before and where parents continued to reside. Whatever the merit of this argument at that time, it cannot be revived now that the order is final. It is highly significant that no party challenged the court's jurisdiction at the initial stages of the proceeding. In fact, the issue of jurisdiction was raised but at the time all parties, including father's attorney, agreed that the Vermont court had authority to adjudicate emergency matters concerning C.P. See *Peery*, 219 Cal. Rptr. at 887 (noting that a collateral jurisdictional attack is not appropriate where issue of jurisdiction was a factual matter and actually litigated). Further, despite the court's invitation to file a motion challenging jurisdiction, no party did. Without a motion, no evidentiary record was created on the factual questions related to the jurisdictional issue — such as whether mother abandoned C.P. or whether C.P. was subject to or threatened with abuse or neglect. Mother stipulated that C.P. was

CHINS due to lack of parental care, and the CHINS order became final.

■ ■ ¶ 21. Next, we turn to the court's termination-of-parental-rights decision. Jurisdiction for termination could not be based on the emergency provision of the UCCJA because it is a permanent order. *In re D.T.*, 170 Vt. at 156, 743 A.2d at 1083; see *In re A.L.H.*, 160 Vt. 410, 414-15, 630 A.2d 1288, 1291 (1993) (explaining that emergency jurisdiction limited to temporary orders). By the time the initial disposition report requesting termination was filed in November 2010, C.P. had lived in Vermont for more than six months. Thus, Vermont had become C.P.'s home state, 15 V.S.A. § 1031(5) (defining home state as the place the child has lived for six months), and, as in *In re B.C.*, the court could exercise jurisdiction on this basis. 169 Vt. at 5, 726 A.2d at 49.[2]

¶ 22. Parents attempt to distinguish *In re B.C.* on several bases. Parents emphasize that termination of parental rights in this case was sought at the initial disposition stage, and therefore allege that it was inextricably linked to the faulty exercise of jurisdiction in the CHINS case. Parents also claim that Vermont's jurisdiction was precluded because New York did not explicitly decline to adjudicate the matter. Finally, parents argue that the CHINS adjudication cannot be final as to father because he did not stipulate to the CHINS findings, which were not related to him. We address these challenges in turn.

■ ¶ 23. It is not determinative that termination was sought at the initial disposition stage, rather than in a subsequent motion.

---

[2] Father rejects the notion that by the time DCF requested termination Vermont had become the child's home state and the court could exercise jurisdiction on that basis. Father claims: "If the erroneous assumption of jurisdiction could be cured by the erroneous retention of jurisdiction, the UCCJA would be rendered meaningless and ineffectual." This argument fails for two reasons. First, it ignores that a separate proceeding is commenced upon the filing of the termination request. Second, it assumes that home state jurisdiction is automatically invalidated based on how the child entered the state. This is not correct. Even assuming that C.P. was improperly brought or kept in Vermont — a conclusion we do not reach — home state jurisdiction under the UCCJA is not nullified. It could form the basis for referring jurisdiction to another state, but does not invalidate jurisdiction. As another court explained, "while the improper method by which a child came into the jurisdiction may cause a court in equity to refuse to *exercise* jurisdiction over a child, it does not deprive the court of its otherwise existing legal subject matter jurisdiction to determine custody." *State ex rel. In re R.P. v. Rosen*, 966 S.W.2d 292, 303 (Mo. Ct. App. 1998).

The CHINS decision ended one phase of the proceeding and was a final appealable order. See *In re P.J.*, 2009 VT 5, ¶ 11, 185 Vt. 606, 969 A.2d 133 (mem.) (noting that res judicata applies to CHINS decision because CHINS is "a final judgment"). Thus, further action in the juvenile case commenced a new proceeding. See *Columb v. Columb*, 161 Vt. 103, 112, 633 A.2d 689, 694 (1993) (explaining that minor's home state may change over time). Specifically, the termination petition initiated a new stage of the proceeding, and the basis for jurisdiction had to be considered anew at that point. See *In re E.X.J.*, 662 S.E.2d 24, 29 (N.C. Ct. App. 2008) (concluding that home-state jurisdiction was established for termination because child had resided in state for more than six months since initial emergency order and no other intervening custody proceedings were initiated in another state); *In re L.F.B.*, No. M2005-00697-COA-R3-PT, 2005 WL 2978964, at *5-6 (Tenn. Ct. App. Nov. 7, 2005) (explaining that termination is separate from dependent neglect proceeding and home-state jurisdiction may be established in the interim).

¶ 24. We recognize that in *In re B.C.* we noted that a termination petition starts a new proceeding if it is not part of the initial disposition process. *In re B.C.*, 169 Vt. at 5, 726 A.2d at 49. To the extent that that language can be taken as a ruling that disposition generally, and termination of parental rights at disposition specifically, does not start a new proceeding, we clarify that this interpretation is erroneous. In view of our finality conclusion with respect to a CHINS merits adjudication, disposition is necessarily a separate proceeding, irrespective of whether termination is sought at that time. It is separately defined by statute and requires separate procedures. See 33 V.S.A. § 5317. The UCCJA defines "custody proceeding," but leaves the definition of the basic component "proceeding" undefined, leaving the matter to state law. 15 V.S.A. § 1031(3).[3] Thus, our definition of proceeding controls for UCCJA purposes.

¶ 25. In addition, the interest of New York did not preclude Vermont from adjudicating the proceeding. We recognize that New York had a strong interest in this matter, especially in the

---

[3] The UCCJEA also does not specifically define proceeding although its definition of child custody proceeding suggests a difference between a proceeding involving termination of parental rights and a proceeding not seeking this remedy. See 15 V.S.A. § 1061(4); see also *In re R.W.*, 2011 VT 124, ¶ 14.

beginning stages. While the record is not fully developed on this point because no challenge to the court's emergency jurisdiction was raised, it seems evident that the matter should have been originally adjudicated in New York given that it was the home state of parents and C.P. Nonetheless, this recognition does not automatically invalidate what occurred. As set forth above, even though the jurisdictional question was raised, no party challenged Vermont's CHINS adjudication or moved to have the matter transferred to New York. Further, because Vermont was C.P.'s home state by the time the termination petition was filed, Vermont's jurisdiction was not dependent on New York specifically declining to exercise jurisdiction. 15 V.S.A. § 1032(a)(1)(A). Certainly, Vermont could have declined jurisdiction in favor of a more convenient forum, but there were no proceedings ongoing in New York at that time. See *Miller v. Miller*, 2008 VT 86, ¶ 18, 184 Vt. 464, 965 A.2d 524 (explaining that "question of whether jurisdiction *exists* . . . is separate from the question of whether it should be *exercised*").

¶ 26. One of the main purposes of the UCCJA is to "avoid jurisdictional conflict with courts of other states and to discourage continuing controversies over child custody in the interest of more stability and security for the child." *In re N.H.*, 2005 VT 118, ¶ 7, 179 Vt. 537, 889 A.2d 727 (mem.). Here, Vermont's exercise of jurisdiction does not contravene that purpose. There was simply no conflict between Vermont and New York regarding the juvenile. Cf. *In re A.L.H.*, 160 Vt. at 416, 630 A.2d at 1291-92 (identifying competing orders of Vermont and South Carolina). New York DSS was the social services agency originally involved in C.P.'s care and had, in fact, initially placed C.P. in Vermont. After placement, DSS continued working with Vermont DCF on C.P.'s case, and the DSS caseworker even testified at C.P.'s termination proceeding. Thus, there is no reason that Vermont's exercise of home state jurisdiction was inappropriate.

¶ 27. Finally, we address father's argument that the CHINS adjudication was not final as to him because the allegations did not involve him. Father's argument is unavailing. Father was a full party in the CHINS proceeding. He raised the jurisdictional question but never followed through with a challenge to jurisdiction despite being invited by the court to do so.

¶ 28. The focus of a CHINS proceeding is the welfare of the child, and therefore a court may adjudicate the child as

CHINS even if the allegations are established as to one parent but not the other. See *In re F.P.*, 164 Vt. 117, 121-22, 665 A.2d 597, 600-01 (1995); see *In re E.X.J.*, 662 S.E.2d at 30 (explaining that abuse, neglect and dependency proceedings are focused on juvenile and do not require a finding related to each parent's conduct). Further, although the CHINS determination is a temporary one for purposes of exercising emergency jurisdiction, it is nonetheless a final appealable order. The CHINS proceeding determines issues critical to the child's welfare and custody status, and while not the last word on the subject, it is certainly a final judgment. The CHINS merits decision is final and cannot be collaterally attacked by father any more than by mother. Further, it can form the basis for a termination petition pertaining to father even if the allegations therein were not directed particularly at father. *In re B.H.*, 174 Vt. 554, 556, 811 A.2d 213, 215-16 (2002) (mem.). To allow father to attack Vermont's exercise of jurisdiction after Vermont has home-state jurisdiction when father knowingly submitted to Vermont's adjudication of the matter, failed to file a motion challenging jurisdiction, and asserted a jurisdictional claim only after he was dissatisfied with the results would "present a classic case of forum shopping such as the UCCJA was intended to avoid." *Peery*, 219 Cal. Rptr. at 888.

¶ 29. As to the merits, mother argues that the evidence and findings do not support the court's conclusion that termination is in C.P.'s best interests. Mother emphasizes that she has completed a mental-health assessment and met her personal goals. She has benefitted from an anger-management class and mental-health services, and she has also attended parenting programs. She claims that these achievements demonstrate that with assistance she could resume parenting within a reasonable period of time, and the court's finding otherwise was erroneous.

¶ 30. The family court may terminate parental rights at the initial disposition proceeding if the court finds by clear and convincing evidence that termination is in the child's best interests. *In re J.T.*, 166 Vt. 173, 177, 179-80, 693 A.2d 283, 285, 287 (1997); see 33 V.S.A. § 5114 (listing best-interests factors). The most important factor is whether the parent will be able to resume parenting duties within a reasonable period of time. *In re J.B.*, 167 Vt. 637, 639, 712 A.2d 895, 897 (1998) (mem.). The reasonableness of the time period is measured from the perspective of the child's needs, *In re B.S.*, 166 Vt. 345, 353, 693 A.2d 716,

721 (1997), and may take account of the child's young age or special needs, *In re J.S.*, 168 Vt. 572, 574, 719 A.2d 865, 867-68 (1998) (mem.). On appeal, we will uphold the family court's conclusions of law if supported by the factual findings and affirm the findings unless clearly erroneous. *In re A.F.*, 160 Vt. 175, 178, 624 A.2d 867, 869 (1993).

■■ ■■ ¶ 31. As related to mother's ability to parent C.P., the court found the following relevant facts: mother had little capacity to adapt her care to C.P.'s needs, the residence where mother and father reside is not a suitable place for C.P., neither mother nor father are capable of living independently of their communal living situation, C.P. suffered developmental delays while living with his parents, mother and C.P. do not share a close bond, and C.P. would suffer lasting damage if reunification were attempted and unsuccessful. This evidence supports the court's finding that despite mother's progress in meeting her personal goals, she will not be able to resume parenting C.P. within a reasonable period of time. See *In re J.J.*, 143 Vt. 1, 6, 458 A.2d 1129, 1131 (1983) (explaining that "while parental improvement is a factor to consider, the real test is whether there is a reasonable possibility of reuniting parent and child within a reasonable period of time"). Therefore, there are no grounds to disturb the court's exercise of discretion, and we affirm.

¶ 32. Next, we turn to father's challenge to the court's decision regarding DCF's reasonable efforts. The reasonable efforts requirement stems from two federal laws. First, Congress enacted the Adoption Assistance and Child Welfare Act of 1980 to provide participating states with funding for foster care, adoption assistance and child welfare programs. *Suter v. Artist M.*, 503 U.S. 347, 350-51 (1992) (describing Act's requirements). To receive funding, the statute requires that participating states adopt certain practices, including making reasonable efforts to prevent removing children from their home and, after removal, to helping the child to return home. 42 U.S.C. § 671(a)(15)(B). The Adoption and Safe Families Act of 1997 (ASFA) amended the statute, prompted by a belief that the "statutes, the social work profession, and the courts sometimes err on the side of protecting the rights of parents." *New York ex rel. N.Y. State Office of Children & Family Servs. v. U.S. Dep't of Health & Human Servs.*, 556 F.3d 90, 95 (2d Cir. 2009) (quotation omitted) (describing legislative history). The amendments clarified the reasonable-efforts

requirement related to removal and reunification, and also implemented a reasonable-efforts finding related to finalizing a permanent placement for the child, which can include reunification efforts or efforts to secure a permanent home, depending on the permanency goal in effect. *Id.*; see 42 U.S.C. § 671(a)(15)(C).

¶ 33. To implement these federal requirements, both reasonable-efforts determinations have been incorporated into Vermont law. 33 V.S.A. § 5102(25) (defining reasonable efforts as "the exercise of due diligence by the department to use appropriate and available services to prevent unnecessary removal of the child from the home or to finalize a permanency plan"). The first reasonable-efforts determination — to prevent removal — must be made as part of a temporary care order. 33 V.S.A. § 5308(c)(1)(B). In addition, upon the filing of a petition by DCF, the court must determine whether DCF "has made reasonable efforts to finalize the permanency plan for the child that is in effect at the time of the hearing." 33 V.S.A. § 5321(h). This can include efforts towards reunification or an alternate permanent living arrangement, depending on the goals of the permanency plan. *Id.* § 5321(h)(1)-(2).

¶ 34. This appeal involves DCF's efforts to finalize a permanency plan for C.P. The record reveals some confusion about what plan was "in effect at the time of the hearing." *Id.* § 5321(h). This likely stems from the fact that termination was requested at the initial disposition stage, and the court combined it with the case-plan review and the reasonable-efforts determination. As stated above, DCF filed the initial case plan on June 14, 2010, and that plan had concurrent goals of reunification and termination of parental rights. That plan was eventually signed by all parties. In November 2010, DCF filed its disposition recommendation — another form of case plan — with a goal of termination and adoption. Parents contested this plan, and the court's review was deferred until the termination hearing. Also in November 2010, DCF filed a petition to terminate parental rights. In March 2011, DCF petitioned for a finding that it had made reasonable efforts to finalize the permanency plan. The request delineated efforts DCF had made to achieve permanency, in this case adoption, but did not list measures to return the child to his home presumably because that was not a goal of the current plan under which DCF was operating at that time. At a permanency planning hearing on March 21, 2011, father's attorney objected to the State's request for a reasonable-efforts finding on the grounds that DCF did not

make reasonable efforts to return C.P. to New York. The court reserved a reasonable-efforts determination for the termination hearing. The matter was not discussed during the termination hearing, and, as set forth above, the court did not find reasonable efforts had been made when it issued its termination decision, but invited DCF to petition for further hearing.

¶ 35. On February 17, 2012, DCF moved for a further hearing on whether it made reasonable efforts to finalize a permanency plan for C.P. DCF argued that because its permanency goal at the time of disposition was to free C.P. for adoption it was not required to demonstrate efforts to reunite C.P. with his parents. See 33 V.S.A. § 5321(h)(2) (explaining plan may include "reasonable efforts to arrange and finalize an alternate permanent living arrangement for the child, in cases where the permanency plan for the child does not include reunification.").

¶ 36. The record of the ensuing conferences reveals that the court and DCF were not in agreement about which permanency plan the court was being asked to review. DCF was operating under the assumption that it was required to show efforts toward achieving the most-recent case plan goal of adoption, while the court felt that the initial case plan that had a goal of reunification was in effect until a new plan was adopted by the court. In response to this concern, DCF emphasized the evidence presented at the termination hearing that demonstrated its efforts to achieve reunification. The court's order finds DCF made reasonable efforts to achieve the concurrent case plan.

¶ 37. Father appeals this order. He does not challenge the evidence on which the court's decision is based or the findings derived therein. Instead he submits that the court lacked jurisdiction to modify the termination order. In addition, he argues that the court's initial finding regarding DCF's lack of reasonable efforts and its comments at the post-termination hearings[4] demonstrate that termination of parental rights was due to factors beyond parents' control.

■ ■ ¶ 38. Father's arguments reveal a basic misunderstanding regarding the court's determination of reasonable efforts.

---

[4] The comments highlighted by father mostly revolve around the distance between parents' home and C.P.'s placement. For example, at the hearing on February 27, 2012, the court remarked that it thought DCF had been "too hasty" in placing C.P. so far from his parents in New York, and that DCF could have tried to place C.P. closer.

Under the statute, this issue of reasonable efforts is separate from whether termination of parental rights is in a child's best interests. Termination of parental rights may be granted at the initial disposition stage if the court determines that it is in the best interests of the child, as set forth in the statutory factors. 33 V.S.A. § 5114. The extent of DCF's efforts to achieve the permanency plan is not one of the best-interests factors to be considered at termination. See *In re J.T.*, 166 Vt. at 180, 693 A.2d at 287 (explaining that extent of efforts to assist parents is not a best-interests factor). Thus, the court is not required to find DCF made reasonable efforts as a prerequisite to termination. *In re J.M.*, 170 Vt. 587, 589, 749 A.2d 17, 19 (2000) (mem.). In saying this, we recognize that the level of assistance provided to parents is relevant in determining whether "a parent is unlikely to be able to resume parental duties within a reasonable period" of time. *Id.*; *In re J.T.*, 166 Vt. at 180, 693 A.2d at 287. But our main point is that whether DCF made reasonable efforts to achieve permanency is a separate question from whether termination is in the child's best interests and the former is not a prerequisite to the latter.

¶ 39. Thus, there is no merit to father's argument that the court improperly modified the termination order by changing its conclusion with respect to reasonable efforts. Although the court addressed both subjects in the same written order, the subjects were separate. Further, although the court's termination decision was final, there was no final determination regarding reasonable efforts. The court simply rejected a reasonable-efforts finding based on the court's understanding of the state of the record, but specifically left the matter open, inviting DCF to move for further hearing on that matter. Without a final decision, the court had not divested itself of jurisdiction on the reasonable-efforts question and was free to revisit that matter.

¶ 40. In addition, neither the court's comments at the post-termination hearings nor the court's initial finding on DCF's lack of reasonable efforts supports a conclusion that termination of parental rights was caused by factors beyond the parents' control. Ultimately, the court found that DCF indeed made reasonable efforts to reunite C.P. with his parents. In addition, while the court was concerned about the distance between C.P.'s foster home and the parents' residence, the court listed many reasons why parents would not be able to resume parenting C.P. within a reasonable time that were unrelated to that distance. The court

found that mother had little ability to adapt her parenting skills as C.P. grows, parents would require assistance with day-to-day tasks, the residence where mother and father reside is not a suitable place for C.P., neither mother nor father are capable of living independently of their communal living situation, C.P. suffered developmental delays while living with his parents, parents and C.P. do not share a close bond, and C.P. would suffer lasting damage if reunification were attempted and unsuccessful. These findings are supported by the evidence and demonstrate that termination was caused primarily by factors within parents' control. See *In re S.R.*, 157 Vt. 417, 421-22, 599 A.2d 364, 367 (1991) (rejecting argument that stagnation caused by factors beyond parents' control where parents were offered services and did not make progress).

*Affirmed.*

¶ 41. **Robinson, J.,** concurring. I concur in the result, and join the lion's share of the majority's opinion. I write separately because I do not believe we need to reach the question of whether *In re B.C.*, 169 Vt. 1, 726 A.2d 45 (1999), should be extended to this circumstance — in which the petition to terminate parental rights was sought at the initial disposition hearing — because parents waived the Uniform Child Custody Jurisdiction Act (UCCJA) jurisdictional challenge to the termination of parental rights (TPR) proceedings on the record.

¶ 42. The majority's analysis hinges on its conclusion that the petition to terminate parental rights in this case started a new action, subject to a new analysis of the court's jurisdiction under the UCCJA. Because C.P. had lived with his aunt in Vermont, pursuant to DCF placement, for nearly seven months at the time DCF filed its petition to terminate parental rights, the majority concludes that Vermont's courts had home-state jurisdiction to entertain that petition pursuant to the UCCJA, without regard to the soundness of the court's prior exercise of jurisdiction in the child in need of care or supervision (CHINS) phase of these proceedings. The majority relies on our decision in *In re B.C.* to support its holding. In that case, we stated, "Unless termination of parental rights is sought at the initial disposition hearing, a TPR petition commences a new proceeding to modify the previous disposition order based on changed circumstances." *In re B.C.*, 169 Vt. at 5, 726 A.2d at 49. This case presents the exact scenario this

Court expressly excepted from the scope of its holding in *In re B.C.*: In this case, DCF *did* seek termination of parental rights at the initial disposition hearing.

¶ 43. Some of the rationales underlying the Court's holding in *In re B.C.* may apply when DCF seeks TPR at the initial disposition, but in *In re B.C.* we considered significant the fact that a TPR petition filed *after* an initial disposition order is essentially a motion to modify a previous disposition order based on changed circumstances — which qualifies as a distinct proceeding for UCCJA purposes. In this case, the termination petition was part and parcel of the initial disposition hearing in the CHINS case, so the argument for treating the petition as a new proceeding under the UCCJA is weaker.

¶ 44. The court's authority under the UCCJA to adjudicate the CHINS case, while unappealed and not subject to collateral attack here, was highly questionable. C.P. was born in New York, his parents lived in New York, and his life was based in New York at the time his mother brought him to Vermont pursuant to the guidance of New York Department of Social Services (DSS). He was in Vermont for a matter of days when DCF intervened and the court began exercising emergency jurisdiction. The parents cannot fairly be characterized as having abandoned the child in Vermont; the trial court found that mother left the child in Vermont after aunt essentially kicked mother out of aunt's home while insisting on retaining custody of C.P. The trial court found that aunt suggested to father that he would be kidnapping C.P. if he took the child when he came to retrieve mother. Rather than contacting the on-call DSS/New York caseworker, as contemplated by the agreement she had signed with DSS several days earlier, aunt contacted Vermont DCF. Instead of taking immediate action to protect the child and then deferring to DSS caseworkers to initiate a proceeding in New York to provide for C.P.'s well-being in the long term, DCF proceeded as if C.P. was a Vermont child. And the trial court proceeded accordingly.

¶ 45. Although I might agree to extend *In re B.C.* in an appropriate case, and to hold that a TPR petition initiates a separate proceeding under the UCCJA even when filed in connection with the initial disposition in a CHINS case, the facts here present a less-than-compelling case for doing so. Because I believe that the child's continued presence in Vermont for a period longer than six months was secured by an improper exercise of ongoing

jurisdiction by the trial court, which itself followed on the heels of the child's aunt's denying the parents the opportunity to take him back to his home state of New York with threats of kidnapping charges, I cannot readily conclude that the child's presence in Vermont was a sufficient foundation to support home-state status.

¶ 46. I do not believe we need to address the issue in this case on account of the parents' own decision to essentially withdraw objections to the court's authority under the UCCJA to proceed with the TPR. At a January 2011 status conference, after the CHINS judgment and before the disposition/termination hearing, and after multiple invitations by the court to brief the jurisdiction issue, the court specifically asked the parties whether they intended to pursue a jurisdictional challenge. Father's counsel stated, "I wanted to consider it, but I feel like it's at a point now where we need to litigate the merits of the determination of the petition." Mother's counsel remained silent, and the discussion proceeded to other topics. The parties did not simply waive the argument that the court lacked authority to proceed with the TPR by virtue of their inaction; when expressly questioned on the record about whether they had ongoing objections to the court's authority, father's counsel said no, and mother's counsel said nothing. I believe a challenge to the court's authority to act under the UCCJA, while not necessarily waivable by inaction, can be expressly relinquished. Having declined the trial court's express invitation to pursue the issue, parents cannot raise it now on appeal. See *In re Estate of Cartmell*, 120 Vt. 234, 240, 138 A.2d 592, 595 (1958) ("If a court has jurisdiction of the subject matter, the parties by their conduct may waive all other jurisdictional requirements.").

¶ 47. Notwithstanding my divergent views on the underlying rationale with respect to the question of the court's authority to act on the TPR petition, I join in the majority's affirmance of the trial court's decision, and concur in the Court's opinion except as to the points raised above.