*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

**ENTRY ORDER**

SUPREME COURT DOCKET NO. 2013-417

MARCH TERM, 2014

| | | |
|---|---|---|
| In re C.L., M.L., D.L. & C.L., Juveniles | } | APPEALED FROM: |
| | } | |
| | } | Superior Court, Franklin Unit, |
| | } | Family Division |
| | } | |
| | } | DOCKET NOS. 37/38/39/40-3-12 Frjv |

Trial Judge: Martin A. Maley

In the above-entitled cause, the Clerk will enter:

Mother and father separately appeal an order terminating their respective parental rights concerning their four children, C.L., M.L., D.L., and C.L. We affirm.

The record reveals the following facts. The four children who are the subject of these proceedings were born to mother and father in June 2003, September 2004, October 2009, and July 2011, respectively. The Department for Children and Families (DCF) has been involved with the family since 2007 as the result of reports concerning domestic violence in the presence of the children, abuse of the children, the parents' substance abuse, and the inability of the parents to meet the children's medical, physical, emotional, and developmental needs. In August 2009, DCF opened a family case in response to further reports of unsafe and unsanitary conditions in the home, the children's poor personal hygiene, and the parents' failure to supervise the children. Since 2009, DCF has provided the family with various services, including Intensive Family Based Services, Children Integrated Services, individual counseling, and support both at home and in school.

In the fall of 2009, shortly after his birth, D.L. was readmitted to the hospital because of a failure to gain weight. There was a domestic altercation at the hospital and father did not live with the family again until the fall of 2011. Father has an extensive criminal history and was incarcerated at times during the instant proceedings.

On March 19, 2012, father was arraigned on charges of driving while intoxicated, reckless endangerment, careless and negligent driving, driving with a suspended license, domestic assault, and interfering with emergency services. Conditions of release included no contact with mother. Father was eventually acquitted of the domestic assault charge.[*]

On March 21, 2012, DCF filed a petition alleging that the children were in need of care or supervision (CHINS) following an incident four days earlier in which the youngest child, then an infant, was injured during a domestic altercation between mother and father. Mother reported to police that father pushed her while she was holding the infant, causing her to fall and the child

---

[*] The record does not provide the disposition of the other charges.

to strike her head. When police arrived, father had left, but the police observed garbage piled knee-to-waist high on the back porch and rooms so cluttered that some doors could not be opened. Decaying garbage and diapers were found in the driveway and on the front porch, and the kitchen floor was covered with dirt and dried food. Choking hazards littered the floors, and D.L. was seen placing objects in his mouth and eating food off of the floor.

On March 22, 2012, the family division of the superior court issued a temporary care order placing the children in DCF custody. The order included factual findings stating that the family home posed health hazards, and that the parents were unable to keep the children safe. In May 2012, mother moved to the Lund Home with the youngest child, while the other children remained in foster care. Mother was discharged from the Lund Home in August 2012 under a safety plan that included her agreement that she stay away from father.

At a merits hearing in June 2012, the parties submitted stipulated findings, upon which the court based its CHINS adjudication. At the August 30, 2012 disposition hearing, the court approved DCF's plan of services with concurrent goals of reunification or adoption. The parties understood that DCF would attempt to facilitate reunification first with mother, and if unsuccessful, with father. The parties agreed to the disposition and the plan of services, but father filed specific written objections to factual findings in the disposition report. Father did not request a hearing to contest any of the facts stated in the report but rather wanted a record of his objections, particularly to findings of his abusive conduct and need to engage in a batterer's intervention program.

Due to concerns about mother's mental health issues, which affected her ability to maintain her own stability and meet the needs of her children, DCF had a psychologist evaluate her in September 2012 to provide some clarity as to her mental status and its impact on her ability to parent her children. The psychologist diagnosed mother with borderline personality disorder, observing a persuasive pattern of interpersonal instability, reactive and cycling mood disturbances, periods of crisis of self-image, reckless substance abuse, gross affective instability and anxiety, an unstable temper marked by anger and impulsivity, and numerous efforts to avoid real or imagined abandonment. The psychologist noted mother's highly unstable emotional presentation, opining that it was unlikely she could achieve the stability required to meet the extreme needs of her children.

In December 2012, DCF removed the youngest child from mother's care because mother had been in contact with father. In January 2013, mother filed a motion to modify the disposition order, and the following month, DCF filed a petition to terminate mother's and father's parental rights with respect to all four children. DCF's petition was heard over four days between July and September of 2013. The court denied mother's motion and granted DCF's petition, concluding that both parents' ability to care for the children had stagnated, and that the best interests of their children required terminating their rights.

Both mother and father appeal the termination order. Mother argues that the evidence does not support the court's conclusion that her contact with the children is, on balance, a negative in the children's lives and may be terminated in the children's best interests. For his part, father argues that: (1) the evidence was not sufficient to support the findings that the court identified as warranting the termination of his parental rights; (2) the court erred as a matter of law in concluding that a reasonable period of time had passed for reunification; and (3) the court

erred by not fully analyzing the family relationships involved, and the impact of termination on the relationships among the siblings.

We first address mother's argument, which relies upon the statutory best-interest factors concerning, among other things, the parent-child relationship. See 33 V.S.A. § 5114(a)(1), (4) (requiring court to consider child's relationship with parents and others and whether parents play constructive role in child's life). Citing the court's findings that she and the children love each other, mother notes the absence of any evidence that the termination of that relationship will not harm the children. She acknowledges certain findings undercutting the significance of her relationship with the children—the children have not sought more contact with mother; they appear stressed by visits with her; they have struggled before and after those visits; and mother engages in adult conversations about father with the children—but contends that the evidence does not support those findings.

As mother points out, the court found that she cares very deeply for the children, that the children express love and affection for the parents, and that, in turn, the parents are able to express love and affection for the children. The court also found that mother had made slow but consistent progress in addressing her substance abuse, housing issues, and mental health problems. Nevertheless, the court terminated mother's parental rights, finding that she had not demonstrated an ability to apply, beyond a basic level, parenting skills that she had learned, and that she had not progressed to the point where she would be able to care independently for the children, who have specialized needs, and provide them with a safe, stable, and permanent home environment. The court found that mother was still unable to focus and provide individual attention to the children, and thus placed them at risk, even in a structured setting, to the extent that DCF was not able to increase the length or frequency of the visits over time. Mother does not address these findings and conclusions, which are supported by the record, but rather challenges specific findings that the court made concerning her supervised visits with the children. We find support in the record for each of those findings.

Mother first challenges the court's finding that the children have not sought more contact with her. She contends that the finding is undercut by the testimony of one of the foster parents that the children go "back and forth" regarding whether they want to live with their mother. The comment mother relies upon was made in the context of testimony in which the foster parent noted that one of the children in particular fears that she would not be safe if she were placed in mother's care. The fact that the children have expressed ambivalence about living with their mother does not necessarily undercut that court's finding that they have not sought increased contact with her.

Next, mother challenges the court's finding that the children "appear stressed by the visits." According to mother, the testimony at the termination hearing shows only that the children are stressed at visits and does not link their stress to their best interests or to her role in their lives. As mother acknowledges, there was testimony that the oldest child gets upset and acts out before and after visits, that M.L. can become reserved before visits and is tearful after visits, that the two older children use baby voices before and after visits with mother, that D.L. does not want to go to visits, and that it can be hard to redirect his misbehavior following visits. This testimony supports the court's finding that the children "appear stressed by the visits."

Finally, mother argues that although the evidence supports the court's findings that she continues to engage the children in adult conversations during visits, there was no evidence that

3

this problem affected visits generally or negated the happiness that the children derived from her company. There are several examples in the record of testimony concerning mother discussing inappropriate topics with the children. The court's finding on this point serves as an example of how mother has been unable to apply learned parenting skills in visits. In short, it is supported by the record and is only a small part of the court's larger point that mother has not been able to develop the parenting skills necessary to provide the children with a safe and stable environment. We find no basis to overturn the court's termination order with respect to mother. See In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29 (stating that conclusions of law will be upheld if supported by factual findings that are not clearly erroneous).

Father first argues that the evidence was insufficient to support the findings that the court identified as warranting a termination of his parental rights—father's domestic violence and failure to engage in a batterer's intervention program, his lack of an automobile and his car accidents, and his relationship with a new partner. Upon review of the record, we conclude that the evidence supports the court's findings and termination order.

In terminating father's parental rights, the court found that father had not been willing to engage and participate in some of the services necessary for him to meet the needs of the children. Specifically, the court noted father's failure to participate in team meetings and adequately address domestic violence issues. With respect to domestic violence, the court acknowledged that father had objected to the disposition requirement that he participate in a batterer's intervention program—in part based on the fact that he had not been convicted of domestic violence and would not admit that he had physically abused mother—but nevertheless concluded that father could have benefitted from domestic abuse counseling irrespective of the dismissal of the domestic abuse charges stemming from the March 2012 incident. There is ample evidence in the record supporting this finding and demonstrating that domestic violence was an important issue that father had to address to place himself in a position to reunite with his children.

Domestic violence was a central concern from the time DCF opened a case on this family. Indeed, father himself signed a stipulation in the CHINS proceeding stating that he and mother "had engaged in a verbal and physical argument" in the presence of the children, and that both mother and the parties' infant daughter were injured during the course of this "physical argument." The stipulation he signed also stated that DCF had provided a number of services over the years "to address ongoing issues of violence in the home," among other things. The Court admitted a copy of a final relief from abuse order secured against father by mother, giving substance to the generalized concerns about domestic violence that appear frequently throughout the record. Although father emphasizes his disagreement with findings in the disposition report concerning his abusive conduct and with the report's requirement that he participate in a batterer's intervention program, he elected to file written objections rather than challenge the report's findings or the programming requirement at a contested disposition hearing. In any event, notwithstanding father's continuing denial of his role in domestic violence in the family home, the evidence supports the court's finding that father could have benefitted from, but failed to participate in, a program addressing domestic violence. In re A.F., 160 Vt. 175, 178 (1993) (stating that when findings are attacked on appeal in termination case, "our role is limited to determining whether they are supported by credible evidence," leaving "it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence").

Regarding automobiles, the court found that father had struggled with transportation issues due to his lack of a reliable vehicle and a driver's license, but that he had regained his license in April 2013. The court also found that father had been involved in two automobile accidents within the previous year, resulting in memory loss and other physical ailments. Each of these findings is supported by the evidence. Although the court noted DCF's concerns that father had been consuming alcohol prior to the accidents, as well as father's denial that he had been drinking, its conclusions did not rest on any finding that father had, in fact, been drinking and driving on those occasions. In fact, transportation issues were not even mentioned in the court's conclusions concerning a change of circumstances and the children's best interests.

Finally, the court noted DCF's contention that father's moving in with a new partner and her children demonstrated a lack of commitment to having his children returned to his care. Father finds fault with the following court finding: "This suggests to the court that father is resolved that the children will not be placed in his custody and so he is moving on with his life." It is not surprising that the court believed this to be the case, insofar as father himself testified at the termination hearing that he did not expect to get his children back because of his criminal record and that he was not "really set up for" it. Moreover, the trial court found, based on competent evidence, that father had failed to attend important DCF team meetings for a number of months. Given this evidence, we find no error in the trial court's inference that father was resolved that the children would not be placed with him, and was moving on with his life.

Next, father argues that the court failed to make the required forward-looking analysis by first evaluating the children's needs and then determining at what point in the future the parents would be in a position to parent the children. See In re B.M., 165 Vt. 331, 337 (1996) (stating that critical inquiry as to whether parent will be able to resume parental duties within reasonable period of time is "forward-looking"). Again, we find no basis to overturn the termination order. The court noted father's failure to engage in DCF services to address the issues that resulted in the children being placed in state custody. In particular, father remained in denial regarding the role that he played in the domestic violence that led to state intervention. Meanwhile, as the court noted, the children had made substantial progress in foster care over what is a significant period of time considering their ages and special needs. As the court stated, given the children's need for permanency, it was not reasonable to delay freeing them for adoption in the hope that their parents would show signs of attaining the skills necessary to address the children's specialized needs. This is not a situation where father made substantial progress toward reunification since the filing of the termination but the court "conclude[ed] that a reasonable period of time ended years before the termination-of-parental-rights hearing." Id. Rather, this is a situation where father made little if any progress toward reunification as anticipated in the disposition case plan, and the children, who have been in foster care for a lengthy period of time, are in need of stability and permanency in their lives. See In re C.P., 2012 VT 100, ¶ 30 (stating that reasonableness of time period is "measured from the perspective of the child's needs, and may take account of the child's young age or special needs").

Lastly, father argues that the court erred by ignoring the fact that the children were split among three foster families. According to father, the court was bound to consider that DCF's proposed disposition would not only end the children's relationships with their parents, but also would place them in separate homes. In father's view, had the court done so, the first of the best-interest factors would have weighed in favor of rejecting DCF's motion to modify the current disposition. See 33 V.S.A. § 5114(a)(1) (requiring consideration of "interaction and interrelationship of the child with his or her parents, siblings, foster parents, if any, and any other

5

person who may significantly affect the child's best interests"). We do not find this argument persuasive. The court terminated the parents' parental rights without limitation to adoption, but did not set forth an adoption plan. While the court found the children to have benefitted significantly from their current placements, and further noted the foster families' willingness to adopt the children, the termination order was based primarily on the unlikelihood that the parents would be able to resume their parental duties within a reasonable period of time, given the parents' limited progress toward achieving that goal and the children's special needs. In any event, the court found that: (1) the children's paternal aunt had demonstrated an ability to meet the emotional, physical, and developmental needs of M.L. and C.L., was committed to adopting them, and was willing to adopt their oldest sibling if she did not remain in her current foster placement; and (2) D.L., who had been diagnosed with autism and had special medical needs, was thriving in the home of his foster family, with whom he had formed an attachment and who was committed to adopting him. D.L.'s foster mother testified that D.L. had had regular visits with his three siblings and would continue to have contact with them after adoption.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
John A. Dooley, Associate Justice

_____
Beth Robinson, Associate Justice