VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.     24-AP-105



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SEPTEMBER TERM,   2024

| | |
|---|---|
| In re A.D. & A.D., Juveniles<br>(S.D., Father\*) | }   APPEALED FROM:<br>}<br>}   Superior Court, Lamoille Unit;<br>}   Family Division<br>}   CASE NOS. 22-JV-00855 & 22-JV-00856<br>    Trial Judge: Mary L. Morrissey |

In the above-entitled cause, the Clerk will enter:

Father appeals from the termination of his residual parental rights in twins Au.D. and Az.D.  Mother voluntarily relinquished her rights.  We affirm.

The record indicates the following.  Au.D. and Az.D. were born in December 2018.  They were placed in the custody of the Department for Children and Families (DCF) shortly after their birth due to parents' history with DCF regarding their older children.  In November 2019, the twins were returned to mother's care pursuant to a conditional custody order (CCO).  The CCO expired before it could be extended as requested by DCF.  Parents lived together intermittently.  In 2020, father was charged with domestic assault against mother.  His conditions of release prohibited him from having contact with the children.

In June 2022, mother asked that the twins be placed in DCF custody because they were not safe in her care, she was uncertain if she was feeding and bathing them regularly, and she needed help with her mental health.  Father was not involved in the children's lives at that point because of his conditions of release.  The children were placed in DCF custody in June 2022 and mother stipulated that they were in need or care or supervision.

DCF filed a case plan that included action steps for both parents and a recommended goal of reunification with mother.  At the disposition hearing, the court modified the case plan to include father as a reunification option and to include as an action step that father "complete an assessment with a domestic violence specialist who has mutually agreed upon qualifications and follow all recommendations."  At the time of the court's disposition order, father was still not allowed to have contact with the twins.  The court required a domestic-violence assessment based on father's history with DCF, his alleged physical abuse and domestic violence toward his children and partners, and his failure to make behavior changes or understand the impact that domestic violence had on his children.

The State moved to terminate father's rights in June 2023. Following several days of hearings in late 2023 and early 2024, the court issued a March 2024 decision granting the State's request. It made the following findings. While father made some progress toward the expectations in the case plan, he failed to engage in a domestic-violence assessment. Father met with a social worker in January 2023 who conducted a "social work risk assessment screening note" for a "Relationship Health and Safety Screen." Father did not discuss engaging in this assessment with his DCF caseworker in advance of doing so, and DCF did not agree that the social worker was an appropriate person, or had the required qualifications, to conduct a domestic-violence assessment. The social worker did not characterize her assessment as a domestic-violence assessment. The court found that the information contained in this assessment appeared to be substantially based on father's self-reporting. Father did not timely sign a release for the DCF worker to speak with the social worker and the caseworker did not receive the assessment until May 2023. The caseworker did not consider the assessment to be a domestic-violence assessment for numerous reasons detailed in the court's decision.

A new DCF caseworker was assigned in August 2023 and he informed father that the assessment referenced above was not satisfactory. The caseworker encouraged father to meet with a DCF domestic-violence specialist to engage in a domestic-violence assessment but father declined. The caseworker attempted to speak with the social worker in December 2023 but was told that father had not signed a release that would allow it.

Due to his conditions of release, father did not have contact with the children for approximately three years and he did not play a caregiving role for them during that time. Father gradually resumed contact with the children in August 2023, beginning with letters and progressing to thirty-minute video contact with the children twice a week, facilitated by an Easter Seals Family Coach. Aside from one in-person holiday visit at the DCF office, all of father's contact with the children was virtual and supervised by Easter Seals.

At the time of the court's termination order, father and an older child lived with father's parents in their home. Au.D. and Az.D. lived with their maternal grandmother. The children have special needs, including speech and occupational delays. Given their needs and trauma history, they were heavily engaged with community-based providers. The children had a positive relationship with their maternal grandmother and her extended family. Grandmother loved the children and was meeting their needs.

Based on these and other findings, the court concluded that father stagnated in his ability to parent the children. It recounted the history of the proceedings as set forth above. It found that father did not meet the expectations in the December 2022 case plan. He did not complete a domestic-violence assessment as required, although efforts were made to connect him with a domestic-violence specialist. Father had no personal contact with the twins from June 2020 until virtual contact began in October 2023, which was four months after the goal date for reunification. Father had only one supervised in-person visit with the children by the time of the court's order. The children had been in DCF custody twice, the second time for a year before DCF moved to terminate father's rights. Father did not reunify with the children in the timeframe set forth in the case plan and given the children's complex needs and the significant work that remained to be done, the court found it clear that father could not resume his parental duties within a reasonable time.

The court then considered the statutory best-interest factors and concluded that they all supported termination of father's rights. It explained that father had limited contact with the children and they had not looked to him to meet their daily needs for more than half of their lives. There was no evidence that the children had any significant attachment to father, and they

had essentially no contact with father's extended family for a significant period of time. The children's maternal grandmother, by contrast, had remained involved in the children's lives from the outset. The children looked to maternal grandmother for comfort and affection and she met their needs. The children also had positive relationships with other members of their maternal extended family. As to the most important best-interest factor, the court concluded that father could not resume parenting the children within a reasonable time. It emphasized that the children had not been in father's care since they were approximately eighteen months old and they greatly needed consistency and permanency. For these and other reasons, the court concluded that termination of father's rights was in the children's best interests. This appeal followed.

Father first argues that the court erred in finding that he stagnated in his ability to parent. He asserts that he made progress in addressing the case-plan requirements and points to evidence that he believes supports his position, such as the removal of conditions that prevent contact with the children and his living situation. Father also asserts that the court erred in assessing the children's best interests. According to father, he should have been given more time to complete the case plan requirements, it was in the children's best interests to maintain a connection with him, and the court should have crafted a remedy to preserve the family unit.[*]

In considering a petition to terminate parental rights following an initial disposition order, the trial court "must find first that there has been a change in circumstances; and second, that termination of parental rights is in the child's best interests." In re D.F., 2018 VT 132, ¶ 29, 209 Vt. 272. "A substantial change of circumstances is most often found when a parent's ability to care for a child has either stagnated or deteriorated over the passage of time." Id. (quotation omitted). "In assessing [a] child's best interests, the court is guided by . . . statutory criteria," the most important of which is "whether the parent will be able to resume parenting duties within a reasonable period of time." Id. "As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." Id. ¶ 30 (quotation omitted).

There was no error here. The court recognized that father made some progress in addressing the case plan goals. But "the mere fact that a parent has shown some progress in some aspects of his or her life does not preclude a finding of changed circumstances warranting modification of a previous disposition order." In re B.W., 162 Vt. 287, 291 (1994) (quotation omitted). Ultimately, the court found that father failed to meet the case plan expectations. He

---

[*] Father also suggests that DCF failed to use "reasonable efforts" to finalize a permanency plan because it refused to consider his mother as a potential placement. The reasonable-efforts determination is separate from the issues presented at termination. In re C.P., 2012 VT 100, ¶ 38, 193 Vt. 29 (explaining that "extent of DCF's efforts to achieve the permanency plan is not one of the best-interests factors to be considered at termination"). In any event, and putting aside preservation issues, the court was not obligated to consider father's mother as a placement option in determining whether father's rights should be terminated. See In re S.B., 174 Vt. 427, 428 (2002) (mem.) (explaining that termination proceeding "is not a custody case" where court must balance respective advantages of different placement options, but is instead "a legislatively created . . . proceeding in which the court is required to weigh specified statutory factors when determining whether to grant a petition for termination of residual parental rights"); see also In re S.W., 2008 VT 38, ¶ 13, 183 Vt. 610 (mem.) (rejecting father's argument that court erred in terminating his parental rights by failing to make findings regarding his recommended kinship placements; question before court was whether children's best interests warranted termination of father's rights, not evaluation of potential parental fitness of father's relatives).

did not complete a domestic-violence assessment and he had no contact with the children for more than three years. He had only one supervised in-person visit with the children after they were placed in DCF custody for the second time. The court's findings support its conclusion regarding stagnation. Father essentially disagrees with the way in which the trial court weighed the evidence. However, "our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating . . . parental rights." In re S.B., 174 Vt. 427, 429 (2002) (mem.). Father fails to show that the court erred in finding that he stagnated in his ability to parent.

We reach a similar conclusion as to the court's best-interests analysis. The court applied the appropriate standard and its findings support its conclusion. In concluding its analysis, the court appropriately considered father's prospective ability to resume parenting from the children's perspective. See In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29 ("The reasonableness of the time period [to resume parenting] is measured from the perspective of the child's needs, and may take account of the child's young age or special needs." (citations omitted)). While father argues that he should be given more time, the court found that the children's need for stability and permanency were of paramount concern. The court did not find that the children were significantly attached to father, but even if it had, it had no obligation to maintain such bond "regardless of the cost to the child." In re M.B., 162 Vt. 229, 238 (1994) (recognizing that "[p]ublic policy . . . does not dictate that the parent-child bond be maintained regardless of the cost to the child"). The court concluded here that termination of father's rights served the children's best interests, and having done so, it did not need to "revisit the permanency hearing options contained in 33 V.S.A. § 5531(d) and explain why it [was] choosing termination of parental rights over other options enumerated therein." In re T.T., 2005 VT 30, ¶ 7, 178 Vt. 496. As with his first claim of error, father again challenges the court's assessment of the weight of the evidence and the credibility of witnesses, matters exclusively within the trial court's province. We find no error.

Affirmed.


BY THE COURT:


Paul L. Reiber, Chief Justice


Harold E. Eaton, Jr., Associate Justice


Nancy J. Waples, Associate Justice