NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2023 VT 51

Nos. 22-AP-120 & 23-AP-099

In re K.G. & L.G. Juveniles

Supreme Court

On Appeal from
Superior Court, Bennington Unit,
Family Division

July Term, 2023

Kerry Ann McDonald-Cady, J. (Termination of Parental Rights); Howard A. Kalfus, J. (Rule 60(b)(6) Motion)

Katina Ready of Katina Francis Ready, PLLC, Bristol, for Appellant Father, and Sarah Star, Middlebury, for Appellant Mother.

Charity R. Clark, Attorney General, Montpelier, and Jody A. Racht and Julianne Woolard, Assistant Attorneys General, Waterbury, for Appellee.

Matthew Valerio, Defender General, and Kerrie Johnson, Juvenile Defender, Montpelier, for Amicus Curiae for Office of the Defender General.

PRESENT: Reiber, C.J., Eaton, Carroll and Cohen, JJ.

¶ 1. **EATON, J.** In these consolidated appeals, parents challenge the termination of their residual parental rights in K.G. and L.G. and the denial of their post-termination motion to set aside the merits and disposition orders in this case under Vermont Rule of Civil Procedure 60(b)(6) based on allegations of ineffective assistance of counsel. We find it unnecessary to decide if parents have a constitutional right to effective assistance of counsel in juvenile proceedings and affirm both decisions.

## I. TPR Appeal (Supreme Court Case No. 22-AP-120)

### A. Procedural History—K.G.

¶ 2. We begin with parents' challenges to the TPR decision. Given the nature of parents' claims, we recount the procedural history of this case in detail. Mother has four children in addition to K.G. and L.G., none of whom are in her legal custody or care. At the time of K.G.'s birth in November 2019, mother had an active case plan with the Department for Children and Families (DCF) for an older child in DCF custody. As of November 2019, the disposition goal in that case was termination of mother's parental rights for lack of progress.

¶ 3. Upon K.G.'s birth, DCF filed a petition alleging that she was a child in need of care or supervision (CHINS) and she was taken into emergency DCF custody. Mother reported that father was K.G.'s biological parent. Father was served with the CHINS paperwork and named as father in the petition; he was also appointed counsel.

¶ 4. The State expressed concern for K.G.'s safety given mother's significant history with DCF and her failure to make progress over the preceding twenty-two months on the case plan for the older child referenced above. The State alleged that mother had unresolved issues around substance abuse, mental health, and lack of safe housing. Mother and father had been "couch surfing" prior to K.G.'s birth; DCF observed unsafe living conditions in the home where parents lived in late September 2019, including the absence of working heat as well as sharp implements and drugs within a child's reach. As a result, the State alleged that mother and putative father had not shown DCF they were prepared to care for a newborn, including by finding stable housing.

¶ 5. Mother had also engaged in physically abusive behavior towards the older child, did not appropriately supervise the older child, and had threatened severe violence towards other adults in the community. The State added that mother's issues had been unresolved over the course of more than eleven years and spanned multiple children. As to putative father, the State expressed

2

concerns about substance abuse and his and mother's lack of housing, as well as noting that he ultimately had not been found to be the parent of the older child referenced above.

¶ 6. In its emergency care order, the court cited the factors above related to mother, including sibling evidence, and noted that father had not yet been determined to be K.G.'s parent. The court found that newborn K.G. needed a sober adult to care for her in a safe living environment and that she was at risk of harm in mother's custody.

¶ 7. Following several hearings, the court issued a December 2019 temporary-care order, continuing K.G. in DCF custody. Father and his attorney were present at the initial temporary-care hearing and both parents were given a plan of services in connection with the temporary-care proceeding. At the hearing, the State requested genetic testing for father without objection and father indicated he would work with DCF regarding visitation. No party sought transfer of custody to father. At a second hearing three days later, the State brought paperwork for father to sign regarding parentage but neither parent attended the hearing.

¶ 8. Following another hearing in early January 2020, the court granted the State's request for genetic testing. The court noted that the State's request had not barred father from actively participating in the case and, in its order, it allowed father to join mother during supervised visits. Father did not consistently attend the visits offered, however, and he did not engage in the virtual visits offered during the COVID-19 pandemic. On April 9, 2020, father was established as K.G.'s parent through genetic testing.

¶ 9. In July 2020, K.G. was adjudicated CHINS. Father and his attorney were present at the hearing. The court expressed its belief that father lacked standing to contest CHINS because he had not been adjudicated as K.G.'s parent at the time the CHINS petition was filed. Father's attorney did not object. The court nonetheless inquired multiple times of father if he understood what was occurring, if he had consulted to his satisfaction with his attorney, and if he had any questions. Mother did not present any evidence.

3

¶ 10. The State's case focused on evidence related to K.G.'s siblings and their removal from mother's care. See, e.g., E.J.R. v. Young, 162 Vt. 219, 224, 646 A.2d 1284 (1994) (noting that where evidence reflects "a pattern of abuse and neglect, and a general inability of [a parent] to protect" any of the children, the family division "may rely on evidence of the treatment of a sibling in concluding that a child is a CHINS" (quotation omitted)). Evidence was also introduced about mother's aggravated-assault-with-a-deadly-weapon conviction and her substantiation for physically abusing the older child referenced above. Parents had been "couch surfing," and at the time of the CHINS hearing, parents were living together in father's aunt's home.

¶ 11. The court made findings on the record in support of its CHINS determination. It cited mother's failure to engage in remedial services to address her anger and mental health, which had been recommended in the CHINS case involving her older child. The court also referenced parents' unstable housing; at the time of K.G.'s birth, parents' residence had no working heat. A case plan was provided for both parents in September 2020. That same month, L.G. was born and taken into emergency DCF custody.

¶ 12. The court held a contested disposition hearing for K.G. in December 2020. DCF's proposed disposition plan contained similar service recommendations for parents as those previously identified in documents filed with the court. DCF recommended a goal of reunification with parents by June 2021. Mother sought conditional custody of K.G., which father supported. Father did not seek custody for himself. The court learned that mother left father for approximately ten days in November 2020 due to father's verbal abuse, which caused mother to seek support services and emergency housing. By December 2020, mother was again living with father and his relatives but was working to obtain a housing voucher and find a residence for herself and the children; mother was on a waitlist for a program at Lund. Mother had started mental-health counseling in September 2020 and, at that time, she was consistently visiting the children.

4

¶ 13. The DCF caseworker continued to recommend DCF custody based on mother's extensive history of untreated mental-health needs impacting her parenting and her very recent engagement in services. Father had completed a virtual anger-management class during the summer of 2020 but he had not completed a substance-abuse or mental-health assessment. Father became angry when DCF workers attempted to discuss the service plan with him. His attendance at visits was inconsistent.

¶ 14. The court approved DCF's proposed case plan and continued K.G. in DCF custody. It acknowledged mother's recent work on the case plan recommendations but concluded that K.G. would be at risk of harm in mother's care because mother continued to live with father, which was where the recent incident had occurred that led mother to seek emergency services and housing. The court viewed this incident in the context of other episodes where father was belligerent and aggressive toward DCF workers. Neither parent appealed the CHINS or disposition order for K.G.

B. Procedural History—L.G.

¶ 15. L.G. was born in September 2020 and taken into emergency custody at birth given parents' lack of progress in addressing the issues that brought K.G. into custody ten months earlier. Father executed a voluntary acknowledgement of parentage for L.G. The court continued L.G. in DCF custody in October 2020 following a contested temporary-care hearing. It found that father's refusal to work with DCF in K.G.'s case posed a significant risk if L.G. was returned to mother's care and if parents intended to live together and coparent. The court also considered father's anger a risk factor and found that parents lacked appropriate housing for either child. The court encouraged father to engage and recommended that mother consider reunification without father. The court ordered visitation five days per week.

¶ 16. In December 2020, DCF prepared an initial case plan in L.G.'s case. In March 2021, L.G. was adjudicated as CHINS following a contested hearing. The court found L.G. was CHINS based on several risk factors, including lack of suitable housing and father's refusal to

5

engage with DCF. The court expressed concern that father coped with his anger and frustration by smoking marijuana. It found that mother, who was coparenting and cohabitating with father in a one-room apartment, would not be able to adequately protect L.G. from father.

¶ 17. At disposition, the court maintained L.G. in DCF custody subject to a reunification plan that largely tracked the plan approved in December 2020 for K.G. Neither parent appealed the CHINS or disposition order for L.G.

¶ 18. In June 2021, DCF changed the disposition goal to adoption for K.G. By October 2021, DCF changed the disposition goal to adoption for L.G. as well.

## C. TPR Decision

¶ 19. In April 2022, following a three-day contested hearing, the court granted the State's request to terminate parents' residual rights. It recounted mother's history with DCF and DCF's removal of mother's three oldest children due to mother's inability to care for them. Mother sent a fourth child to live with the guardian of several of her other children at the time that K.G. was removed from her care; she did so out of fear that this child would also be removed from her care. The court also noted mother's conviction for aggravated assault with a deadly weapon in January 2020 for pointing a gun at a neighbor and threatening to shoot him.

¶ 20. The court identified the case-plan goals for each parent, including consistent visitation, and detailed parents' failure to comply with this and several other requirements. Father stopped visiting the children in early May 2021 and Easterseals closed father's case by the end of June 2021 due to his lack of follow through. The Easterseals supervisor had concerns about father's parenting during visits that did occur. The court noted that father resumed visits in January 2022, just before the termination hearing, but he did not attend all the visits offered.

¶ 21. Mother also failed to consistently visit the children. After numerous missed visits, DCF asked mother to confirm her attendance by text each morning. Mother repeatedly failed to do so, which led to cancelled visits. Mother said she had trouble waking up for visits but took few

6

steps to remedy this problem. Easterseals closed its case with mother by November 2021 due to mother's inconsistent attendance.

¶ 22. Mother also failed to consistently engage in mental-health counseling, which her caseworker believed presented a significant barrier to reunification. Mother said she was depressed because she did not have custody of the juveniles. The caseworker emphasized the importance of consistent visitation to mother and tried reduced visits to get mother back on track to no avail.

¶ 23. The caseworker also expressed concern about parents' housing. Parents lived in a motel room with several dogs. Parents chose to keep their dogs rather than accepting stable housing offered to them; they then obtained another dog. Mother's lack of stable housing had been an ongoing issue since one of mother's older children came into DCF custody in January 2019 (prior to K.G.'s birth). The caseworker was unable to assess the suitability of parents' living quarters in person despite multiple attempts to do so.

¶ 24. The children were living together in the same foster home where each had been essentially since birth. The children were closely bonded to their foster parents and to one another. They thrived with the structure and consistency provided by their foster parents.

¶ 25. Based on these and numerous other findings, the court determined that mother and father stagnated in their ability to parent. The court found stagnation most clearly demonstrated by parents' inconsistent visitation. Father's visitation with K.G. was inconsistent from the outset of the case. Mother's visitation with K.G. became inconsistent as of July 2020 and continued after L.G. was taken into custody in September 2020. Despite the caseworker's attempts to engage parents to improve their attendance at Family Time, neither parent followed through. Father chose to stop attending visits in the beginning of May 2021. The court considered both parents' stagnation was due to choices within their control.

7

¶ 26. The court further concluded that the statutory best-interest factors supported the termination of both parents' rights. As to the most important factor, the court determined that neither mother nor father could parent the children within a reasonable time. Father had no contact with the children for almost eight months by his own choice. He had no personal knowledge of the children's needs and did not seek out information from DCF about the children's wellbeing. He did not attempt to improve his parenting by completing a parenting class. The court determined that, through his voluntary conduct, father demonstrated his lack of interest in assuming a parenting role in the children's lives. The court found that father had been provided significant time in which to assume his parenting role.

¶ 27. As to mother, the court cited her current mental health as salient to her inability to resume her parental duties. Mother testified that she missed so many visits and could not let DCF know if she would attend visits because it was hard for her to get up due to her depression. She testified that her depression had gotten to the point where it interfered with her ability to care for herself and there were days in which she said she could not get out of bed and had trouble leaving the house. The court found this troubling. It observed that mother's mental-health needs required more than weekly counseling sessions and that mother oversimplified her mental-health needs by asserting that she would not be depressed if the children were returned to her care. It noted that mother was also unwilling to consider adjusting her medications to address improving her daily functioning.

¶ 28. The court explained that the two main case-plan goals for mother since November 2019 were mental-health counseling and attending all visits with the children. Mother's need to address her mental health through treatment dated to a prior child's case plan in January 2019. Mother had been unable to meaningfully address her mental-health needs despite the passage of almost three years. Her mental-health instability affected her ability to parent the juveniles.

8

¶ 29. The court also looked to mother's behavior toward another child, B.H. (born in November 2015), who mother sent to live elsewhere when K.G. was removed from her care. Mother had not parented B.H. for over two years, which the court found instructive as to mother's ability to resume her parental responsibilities for K.G. and L.G. within a reasonable time. Mother did not set up a guardianship for B.H. and instead chose to leave this important relationship in uncertainty because she feared B.H. would be taken into DCF custody. The court concluded that K.G. and L.G. needed permanency with stable, consistent care providers, particularly given the amount of time that they had been in DCF custody. The children were bonded with their foster parents, who met their daily needs, and the children had thrived in their care. Given these and other findings, the court concluded that termination of parents' rights was in the children's best interests. Mother and father appealed.

## D. Parents' Arguments on Appeal

### 1. Mother's Challenges to TPR Findings and Conclusions

¶ 30. We begin with our well-established standard of review. When termination is sought after initial disposition through modification of a prior order, the trial court must first find "that there has been a substantial change in material circumstances." In re K.F., 2004 VT 40, ¶ 8, 176 Vt. 636, 852 A.2d 584 (mem.). This is most often found when a "parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." In re B.W., 162 Vt. 287, 291, 648 A.2d 652, 654-55 (1994) (quotation omitted). If this threshold finding is made, the court must then consider the factors set forth in 33 V.S.A. § 5114 and determine if "termination of parental rights is in the child's best interests." In re K.F., 2004 VT 40, ¶ 8. "As long as the court applied the proper standard, we will not disturb its findings [on appeal] unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." In re G.S., 153 Vt. 651, 652, 572 A.2d 1350, 1351 (1990) (mem.). "Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in

9

terminating . . . parental rights . . . ." In re S.B., 174 Vt. 427, 429, 800 A.2d 476, 479 (2002) (mem.).

¶ 31. Mother first argues that the court erred in concluding that she stagnated in her ability to parent. Mother contends that she complied with all action steps for both children and demonstrated her ability to safely parent the children during visitation. Mother blames any stagnation on the State and trial court, arguing that they created "dysfunction that exacerbated her depression and made her lose hope of reunifying with her children." Mother further argues that the court erred in finding that: she could have done more to address her mental-health needs; she should have tried to adjust her medications to allow her to wake up to attend visits with the children; and that it was an oversimplification to believe that her depression would be resolved if the children were returned to her care. Mother accuses the trial court of "shifting the goalposts" and engaging in "constant prevarication," and maintains that she was not provided adequate notice of what was expected of her.

¶ 32. We reject these arguments. The trial court found that mother failed to comply with numerous aspects of the case plan: regularly visit the children, consistently engage in mental-health counseling to address her mental-health needs, and work cooperatively with all other service providers (Easterseals). The record supports the court's findings to this effect and the findings support the trial court's conclusion regarding stagnation. Mother plainly had notice of these expectations.

¶ 33. As referenced above, the court found that between April and September 2021, mother missed almost half of her visits with the children. Mother repeatedly failed to confirm by text that she would attend visits, resulting in cancelled visits. Easterseals closed its case with mother by November 2021 due to mother's inconsistent attendance. DCF tried a reduced visitation schedule in November 2021 to get mother back on track. Mother continued to miss visits, however, attending only twelve of twenty-one visits in December 2021 and seven of eleven visits

10

in January 2022. Over the course of several years, mother never progressed beyond visiting the children at the DCF office.

¶ 34. Mother also failed to consistently engage in mental-health treatment. Mother confirmed that she had no mental-health counseling for three-to-four months and that, at the time of the termination hearing, she had only recently started sessions with a new counselor. Her failure to engage with Easterseals, leading to the closure of Easterseals services, is noted above.

¶ 35. The court did not err in finding that mother's stagnation was based on factors within her control. The court recognized mother's testimony that she struggled with depression and that she sometimes could not get out of bed, care for herself, or leave the house. Mother failed to consistently attend mental-health counseling to address these issues. She waited ten months to begin mental-health counseling and then quit this counseling in February 2021 after attending four sessions. It was reasonable for the court to find that the severity of the symptoms mother described warranted increased mental-health treatment. See In re B.R., 2014 VT 37, ¶ 26, 196 Vt. 304, 97 A.3d 867 (recognizing that trial court as factfinder can draw reasonable inferences from facts presented and "draw upon its own common sense and experience" (quotation omitted)). It was also reasonable for the court to find that mother oversimplified her longstanding mental-health issues by asserting that her depression would be resolved if K.G. and L.G. were returned to her care.

¶ 36. The record indicates that mother did not follow through on various suggestions made to her by service providers to improve her attendance at visits or reach out to her support system to help her with waking up in time to send a confirmation text to DCF. Although mother did talk to her doctor about adjusting one medication to address drowsiness as suggested by the Easterseals supervisor, she refused to make any other adjustments to her medications until the children were returned to her care, stating that she did not want to be a "test dummy." Mother also testified that she previously drove father to work at 7 a.m. for three months during the summer of

11

2021, yet she failed to attend numerous visits with the children during this period. The evidence supports the court's finding that mother was responsible for her failure to comply with the requirements of the case plan.

¶ 37. Mother essentially disagrees with the way in which the trial court weighed the evidence and urges us to reach a different conclusion. Mother's disagreement with the court's decision does not demonstrate an abuse of discretion and we do not reweigh the evidence on appeal. See In re S.B., 174 Vt. at 429, 800 A.2d at 479. The court's findings support its conclusion that mother stagnated in her ability to parent the children and that the stagnation was within her control.

¶ 38. Mother next argues that the court erred in concluding that she could not parent the children within a reasonable time. She acknowledges missing visits but contends that she attended enough visits to demonstrate her parenting abilities. Mother blames DCF for not doing enough to support her and contends that it should have done more to find out the current state of her mental health.

¶ 39. Again, we find no error. The record amply supports the court's conclusion on this point. As set forth above, the court found that mother failed to make progress on her two main case-plan goals: consistently visiting the children and attending mental-health counseling. She was unable to meaningfully address her mental-health needs over the course of many years. She did not consistently visit the children. She also chose not to parent another child as of the time that K.G. was taken into DCF custody. At the same time, the children, who were toddlers, needed consistency and structure. They had been in custody since birth and needed permanency; they could not afford to wait any longer for mother to become more consistently engaged in caring for them. Many efforts were made to assist mother in becoming more engaged with visitation to no avail. As with her first argument, mother disagrees with the court's conclusion but fails to show

any error. The record supports the court's conclusion that she could not parent the children within a reasonable time as measured from the children's perspective.

### 2. Parents' Collateral Challenges to Prior Orders

¶ 40.     We turn next to parents' collateral attacks on prior orders in this case. Parents argue for the first time in their TPR appeal that their due-process and fundamental rights were violated during earlier stages of the juvenile proceedings. More specifically, parents assert that father should have been deemed K.G.'s "custodial parent" at the outset of this case and the court should not have issued the emergency care order for K.G. without first evaluating if father could parent K.G. They contend that father was treated "as if he didn't exist" and treated differently because the parties were unmarried. According to parents, father was not given the opportunity to contest K.G.'s removal or the basis for the CHINS petition as to K.G. They complain that L.G. was then removed from parents' care based on father's nonengagement with K.G.'s case. Parents challenge the sufficiency of the findings that L.G. was CHINS.

¶ 41.     At the outset, parents' arguments rely on numerous assertions that are at odds with the record. Father plainly was not treated "as if he didn't exist." He was served with the CHINS petition for K.G., appointed counsel, provided visitation with K.G., and he and his counsel were present or allowed to be present for hearings regarding K.G. Father was provided with goals at the outset of K.G.'s case, even if not yet adopted by the court. Father was in fact not engaged with DCF, as the trial court found, and he failed to consistently visit both children throughout these proceedings despite being provided the opportunity to do so from essentially the outset of K.G.'s case.

¶ 42.     Beyond this, we reject parents' attempts to collaterally challenge prior orders in this proceeding in their TPR appeal. Parents failed to timely object or appeal the initial disposition orders for either child. To overturn these orders, they therefore must "satisfy the criteria for obtaining relief from a final judgment" under V.R.C.P. 60(b)(4) by showing that the judgments

13

are "void." In re C.L.S., 2020 VT 1, ¶ 17, 211 Vt. 344, 225 A.3d 644 (quotation omitted). "[A] judgment is void only if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law." Id. (quotation omitted). "In the context of a collateral attack, the fact that a judgment is erroneous does not automatically make it void." Id.

¶ 43. Parents fail to show that court acted in a manner inconsistent with due process such that the judgments they challenge should be deemed void. "[T]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Brock v. Roadway Express, Inc., 481 U.S. 252, 261 (1987) (quotation omitted). As noted above, father was not ignored or excluded from the court proceedings prior to the April 2020 parentage determination. He was provided notice of the CHINS petition and the temporary-care hearing for K.G. He was appointed counsel and appeared with counsel at the initial temporary care hearing for K.G. Father did not argue at the hearing that he was entitled to immediate custody of K.G. as her "custodial parent." He was not precluded from doing so. Father did not object to genetic testing to determine if he was K.G.'s father. He did not attend a second hearing to sign paperwork that would have assisted in determining his parentage.

¶ 44. The court engaged father and his counsel at the hearings that they attended, including the CHINS merits hearing for K.G. Father did not object when the court opined that it would base its decision on evidence related to mother's ability to care for K.G. Father was also provided with the opportunity for visitation with K.G. from essentially the outset of this case. Father fully participated with respect to hearings regarding L.G. As in C.L.S., the record here does not "reflect a deprivation of due process that would render the CHINS judgment void." 2020 VT 1, ¶ 25.

¶ 45. We agree with the State, moreover, that father's parental status was immaterial to the key issue at the temporary care hearing, i.e., whether K.G. would be at risk if returned to

14

parents' household. At a temporary-care hearing, the court must consider if a "return [to the] home" would be contrary to a child's best interests, including where "[a] return of legal custody could result in substantial danger to the physical health, mental health, welfare, or safety of the child." 33 V.S.A § 5308(a)(1). Parents were cohabitating and the court found that mother posed a risk of harm to K.G. Father does not explain how an award of custody to him would have reduced this risk. Father was also allowed to participate in the temporary-care hearing without regard to his parental status. The record does not support parents' claims of disparate treatment by the court based on father's parental status or that the court denied him the opportunity to be heard on issues related to K.G.'s temporary care.

¶ 46. With respect to the CHINS merits hearing for K.G, mother asserts that, had father been able to present evidence, the court would not have found K.G. at risk in the home that mother shared with father and father's mother. Mother does not identify what this evidence would have been or explain why she could not have presented it; she does not explain how it would have negated the risk of her own behavior as detailed by the court in its decision.

¶ 47. As we have recognized, "[t]he focus of a CHINS proceeding is the welfare of the child, and therefore a court may adjudicate the child as CHINS even if the allegations are established as to one parent but not the other." In re C.P., 2012 VT 100, ¶ 28, 193 Vt. 29, 71 A.3d 1142. The principal issue "is whether, given all of the circumstances, the child is without proper 'parental' care, such that the child's well-being is threatened." In re G.C., 170 Vt. 329, 334, 749 A.2d 28, 32 (2000) (quotation omitted). The evidence related to mother that supported the court's CHINS decision for K.G. was overwhelming and parents were living together. Any error that occurred with respect to father's ability to question witnesses or present evidence was harmless as it would not have changed the outcome.

¶ 48. Parents additionally appear to assert that father's due-process rights were violated because the court's treatment of him as a noncustodial parent in K.G.'s case relieved the State of

15

its burden to prove his unfitness as a parent with respect to L.G.'s case. The record does not support this contention. It is evident that the State retained the burden of proof during these proceedings and the court did not err in considering father's lack of engagement in K.G.'s case in reaching conclusions about L.G. As parents fail to show any due-process violations, there is no basis for us to review the sufficiency of the court's findings that L.G. was CHINS; it is an improper collateral attack on a final order. See In re C.L.S., 2020 VT 1, ¶ 15 (holding that where "alleged errors took place prior to the initial disposition order, which parents did not appeal," they could not raise such challenges in appeal from TPR decision). Even if we were to do so, however, the record supports the court's finding that father was not engaged in the goals provided to him at the outset of the case, even if those goals were not yet part of an adopted case plan for K.G. See In re H.T., 2020 VT 3, ¶ 29, 211 Vt. 476, 227 A.3d 504 (rejecting similar argument, explaining that "[p]arents were on notice from the outset of—and throughout—this case of the parenting deficits that gave rise to state intervention" and "DCF's case plan, the temporary-care order, and discussions at court conferences throughout this case made plain the parenting deficits the parents needed to address"). We find no basis to review any earlier orders in this case and no basis to disturb the court's termination decision.

¶ 49.    Both parents also raised ineffective-assistance-of-counsel claims in their briefs. They sought permission to file a Rule 60(b)(6) motion alleging ineffective assistance of counsel with the trial court and asked to stay the TPR appeal. The Court granted their request in September 2022, and the case was remanded to the trial court for this limited purpose.

## II.  Rule 60(b)(6) Appeal (Supreme Court Case No. 23-AP-099)

### A.  Procedural History

¶ 50.    This brings us to parents' second appeal. In their motion for relief from judgment under V.R.C.P. 60(b)(6), parents asked the trial court to vacate the "prior merits and disposition orders," including the TPR decision. They alleged that their attorneys were ineffective at multiple

critical stages of the CHINS proceeding. They largely reiterated arguments referenced in their TPR appeal, i.e., that father's counsel should have argued that father was K.G.'s custodian and sought immediate visitation with K.G.; the court should have made findings at the temporary-care hearing about father's ability to care for K.G. and the condition of the parties' shared home; father's attorney should have objected to the court's statement that he lacked standing to argue over whether K.G. was CHINS; and that father was not provided goals for his behavior at the outset of K.G.'s case. With respect to L.G., parents argued that father should have been presumed to be a fit parent entitled to custody and that the court should not have considered his lack of engagement in K.G.'s case in determining that L.G. was CHINS. Both parents argued that their attorneys did not advise them of their right to appeal earlier orders. Parents asked the court to apply the standard applicable in criminal cases, Strickland v. Washington, 466 U.S. 668, 694 (1984), to evaluate the merits of their claims.

¶ 51. Following a hearing, the trial court denied parents' motion. The court found it unnecessary to decide if there was a constitutional right to effective assistance of counsel in CHINS cases or to decide if either parent was deprived of effective assistance. Even assuming that the right existed and was violated, the court found that granting parents' request would either (1) yield no benefit for any of the parties; or (2) offend the paramount goal of timely permanency set out in 33 V.S.A. § 5101(a)(4) and federal law and be contrary to the children's best interests.

¶ 52. The court explained that granting parents' request would necessarily mean returning to the merits stage where the State would have to prove that each child was without proper parental care at the time of their birth. That was three-and-a-half years earlier for K.G. and approximately two-and-a-half years earlier for L.G. The court considered this length of time significant. It noted as well that, under federal law, with some exceptions, the State was required to file a TPR petition where a child had been in foster care for fifteen out of the most recent twenty-

two months. Citing 42 U.S.C. § 675(5)(E). The children here had each been in foster care twice that long.

¶ 53. The court reasoned that, if the case returned to the merits stage, there would be two possible outcomes for each child. First, it could find the children were without proper parental care when the CHINS petition was initially filed, which would then require it to consider—in furtherance of the children's best interests—the long-term goal, each child's current situation, and what changes were needed to correct the problems necessitating State intervention. Alternatively, it could find that the State failed to prove that one or both children were without proper parental care when the CHINS petition was initially filed, necessitating their immediate return to parents.

¶ 54. As to the first possible outcome, the court explained that it had considered the statutory best-interest factors in the TPR decision that parents challenged on appeal. It thus found that granting a Rule 60 motion where the TPR merits were found to be established would result in no benefit to parents, the children, or the State. The second possible outcome meant that the children would be abruptly placed in the home of parents with whom they'd never lived, which might be traumatic and harmful. The court found that a thoughtful, planned transition to avoid such harm would further delay permanency for these children who had been in DCF custody for many years.

¶ 55. The court emphasized that parents' Rule 60 motion was made in the context of a juvenile proceeding, which was designed to balance the rights and needs of parents and children. The Legislature made clear that safety and permanency were the paramount concerns in juvenile judicial proceedings. See 33 V.S.A. § 5101(a)(4) (stating that "[t]he juvenile judicial proceedings chapters shall be construed in accordance" with various purposes set forth by statute, including "to ensure that safety and timely permanency for children are the paramount concerns in the administration and conduct of proceedings under the juvenile judicial proceedings chapters"). While ineffective assistance might offend one of the purposes set forth by statute, the court found

18

that the law prioritized permanency over every other purpose except for safety. In this case, the children had been in DCF custody for many years, they had been in the same foster home since birth, and the court determined that they needed permanency. The court thus denied parents' request to vacate the merits and disposition orders in this case under Rule 60(b)(6).

## B. Parents' Arguments on Appeal

¶ 56. Parents argue on appeal that they have a statutory and constitutional right to effective assistance of counsel and that they were deprived of that right. They rely on the Strickland test for analysis, as they did below, and argue the merits of their ineffective-assistance claim. They fault father's attorney for failing to assert father's party status at the outset of K.G.'s case, and fault both attorneys for failing to inform them of their right to appeal earlier merits and disposition orders. Parents reiterate many of the same assertions raised in their TPR briefs. They contend that: father was "treated as if he didn't exist"; he was initially deprived of placement due to lack of party status; he was "deprived of critical hearings"; and he was then "intermittently treated as a party" and "presumed to be unsuitable for a full year before [being] allowed to participate in a contested hearing." As stated above, these assertions are at odds with the record.

¶ 57. Parents further assert that the "prejudice is clear" and, alternatively, that they did not need to show prejudice because father "was deprived of hearings altogether" and because neither party was informed of their right to appeal. Parents also argue that the need for permanency provided by statute cannot supersede the protection of families and they contend that permanency can be best achieved by reunifying families. They acknowledge that the State also has an interest in permanency and finality but argue that it is less important than ensuring that the judgment was consistent with due process. Parents assert that their filing should be considered timely because it was filed "as soon as parents had replacement counsel, during the pendency of the TPR appeal."[*]

---

[*] The Office of the Defender General filed an amicus brief in support of parents. To the extent that amicus raises new arguments, we do not address them. See e.g., Naylor v. Cusson,

¶ 58. We review the trial court's Rule 60 decision for abuse of discretion. Penland v. Warren, 2018 VT 70, ¶ 6, 208 Vt. 15, 194 A.3d 755. Under Rule 60(b)(6), "the court may relieve a party . . . from a final judgment, order, or proceeding" for "any other reason justifying relief from the operation of the judgment." The subsection is available only where the other criteria under Rule 60(b) do not apply. The motion must be filed "within a reasonable time." V.R.C.P. 60(b)(6).

¶ 59. Rule 60(b)(6) is a "general catch-all provision" that is "designed to give the court the flexibility to see that the rule serves the ends of justice." Reporter's Notes, V.R.C.P. 60. Although the rule "must be interpreted liberally to prevent hardship or injustice," its reach is limited. Riehle v. Tudhope, 171 Vt. 626, 627, 765 A.2d 885, 887 (2000) (mem.). The rule "is intended to accomplish justice in extraordinary situations that warrant the reopening of final judgments after a substantial period of time." Id. Relief should be "granted only in extraordinary circumstances," Adamson v. Dodge, 174 Vt. 311, 327, 816 A.2d 455, 468 (2002), mindful that "interests of finality necessarily limit when relief is available," Riehle, 171 Vt. at 627, 765 A.2d at 887.

¶ 60. The court did not err in denying parents' request for relief here. The children have been in DCF custody for years and parents waited until after their rights were terminated before seeking relief under Rule 60. In their motion, parents challenged conduct that occurred at the outset of this case, dating back to 2019. The onus was on parents to raise these arguments earlier. While a child's permanency needs might not always outweigh competing concerns, the court acted within its discretion in reaching that conclusion based on the facts here, given the amount of time that had elapsed. Parents' motion was not filed within "a reasonable time" as required by Rule 60(b). Because we affirm the court's decision on this basis, we do not reach the question of

_____

2007 VT 108, ¶ 22, 182 Vt. 627, 940 A.2d 717 (mem.) ("Except in rare circumstances, our rules do not allow amicus curiae to raise issues for the first time on appeal."); see also 16AA C. Wright & A. Miller, Fed. Prac. & Proc. Juris. § 3975.1 (5th ed. 2023) ("In ordinary circumstances, an amicus will not be permitted to raise issues not argued by the parties.").

whether parents have a constitutional right to effective assistance of counsel in juvenile proceedings.

¶ 61. We agree with the State that the years-long delay between the entry of the merits and disposition orders in 2020 and 2021 and the filing of the Rule 60 motion is patently unreasonable. See generally In re C.L.S., 2021 VT 25, ¶ 38 (Robinson, J., dissenting) (observing that "[i]n general, parties would reasonably be expected to raise challenges that counsel was ineffective during the period preceding an initial disposition order well before the resolution of an appeal of a subsequent order terminating parental rights."). As other courts have observed under similar circumstances, "[w]hat constitutes a 'reasonable time' [under Rule 60] depends on the facts of each case, taking into consideration the interest of finality, the reason for the delay, the practical ability to learn earlier of the grounds relied upon, and the prejudice to other parties." Ex parte E.D., 777 So. 2d 113, 116 (Ala. 2000) (quotation omitted) (considering similar claim of ineffective-assistance in juvenile case under Rule 60); see also In re Georgette, 768 N.E.2d 549, 557-58 (Mass. App. Ct. 2002) (holding that motion raising ineffective assistance of trial counsel under Rule 60(b)(6) in juvenile case "should be granted only in extraordinary circumstances"); Brown v. Enzyme Dev., 380 F. App'x 97, 98 (2d Cir. 2010) (explaining under identical federal rule that, in assessing whether Rule 60(b)(6) motion was filed within reasonable time, court will "scrutinize the particular circumstances of the case, and balance the interest in finality with the reasons for delay, mindful that extraordinary circumstances warranting Rule 60(b)(6) relief typically do not exist where the applicant fails to move for relief promptly" (quotations and citation omitted)).

¶ 62. We recognized in C.L.S. that there is a point at which the statutory goals of permanency in juvenile proceedings outweigh a parent's ability to seek relief from judgment under Rule 60. The parent in C.L.S. argued, post-adoption, that he received ineffective assistance of counsel "at multiple critical points during the CHINS proceeding," including challenging the

21

failure to treat him as "a custodial parent" at the outset of the case. 2021 VT 25, ¶ 3. The trial court dismissed the motion for lack of jurisdiction and we upheld its decision, looking to the language of the CHINS statute. We found our conclusion "consistent with the purpose of the CHINS statute as a whole, which is to protect the best interests of children and to ensure permanency for them within a reasonable time." Id. ¶ 15 (citing In re A.G., 2004 VT 125, ¶ 17, 178 Vt. 7, 868 A.2d 692 ("CHINS proceedings are protective in nature and focus on the welfare of the child, the child's safety and permanency being the paramount concern.")). We emphasized that " 'safety and timely permanency for children are the paramount concerns in the administration and conduct of proceedings under the juvenile judicial proceedings chapters,' " and determined that, in furtherance of these goals, "the procedure for relief set forth in Rule 60 is no longer available to a party" once a child has been adopted. Id. (quoting 33 V.S.A. § 5101(a)(4)).

¶ 63. While the trial court's jurisdiction over parents' motion is not at issue here, the concerns for timely permanency hold equal force under the facts of this case. The court appropriately considered this important interest in weighing the competing concerns presented by parents' request. See id. (explaining that court should interpret juvenile statute "in light of [Legislature's] stated policy concern for timely permanency in juvenile proceedings"). As the Massachusetts Court of Appeals recognized in Georgette, 768 N.E.2d at 558, "[a]chieving finality and minimizing delay and uncertainty are appropriate considerations when acting on any Rule 60(b) motion" but "they are prime considerations . . . when the rights, interests and welfare of children in custody and adoption proceedings are involved."

¶ 64. In this case, the court held a hearing and weighed the evidence presented. It was mindful of parents' arguments, the post-termination procedural posture of the case, and the nature of the relief sought by parents. It considered parents' claims and the children's interest in permanency. It acted within its discretion in balancing all of these competing considerations and concluding that relief was not warranted under the rule given the amount of time that had elapsed

since the children were taken into custody. It appropriately "scrutinize[d] the particular circumstances of the case and balance[d] the interest in finality with the reasons for the delay." Brown, 380 F. App'x at 98.

¶ 65. The court appropriately considered the context—a juvenile proceeding—in which the motion was filed. We do not read its decision to hold, and we do not hold, that procedural due-process protections must always be subservient to a child's need for timely permanency, as parents appear to suggest. The court here expressed concern about the upheaval that would result if it were to order the children returned to parents' care. It concluded that the children's permanency needs outweighed any competing interests of parents in having the disposition orders set aside given the facts of this case. In other words, their motion was filed outside of "a reasonable time" as required by Rule 60(b).

¶ 66. As the State points out, moreover, the question before the trial court was whether a basis existed to vacate all existing orders in this juvenile case under Rule 60(b)(6); the court was not obligated to make findings as to ineffective assistance in reaching its conclusion. The court did not violate parents' fundamental rights in addressing the Rule 60 motion.

¶ 67. Finally, we reject parents' assertion that, by denying their motion, the court violated Article 4 of the Vermont Constitution. It is settled that "Article 4 does not create substantive rights," but "it does ensure access to the judicial process." Shields v. Gerhart, 163 Vt. 219, 223, 658 A.2d 924, 928 (1995); see also Levinsky v. Diamond, 151 Vt. 178, 197, 559 A.2d 1073, 1076 (1989) (explaining that Article 4 "has never been held by this Court . . . to give rise to a substantive constitutional right" and "[i]nstead, it has been treated as the Vermont equivalent of the federal Due Process Clause"), overruled on other grounds by Muzzy v. State, 155 Vt. 279, 583 A.2d 82 (1990). Parents were afforded sufficient process to raise their ineffective-assistance claims here.

¶ 68. As discussed above, "[t]he fundamental requirement of [procedural] due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Bandler v. Cohen

Rosenthal & Kramer, LLP, 2015 VT 115, ¶ 13, 200 Vt. 333, 131 A.3d 733 (quotation omitted).

Parents first alleged ineffective-assistance in their TPR briefs and they offer no compelling reason why they could not have raised these claims at an earlier stage of these proceedings. The matter was remanded, parents filed a Rule 60 motion, and the trial court held a contested hearing on that motion where parents and their expert testified. The record reflects that parents were provided with access to the judicial process here even if they disagree with the result. We find no grounds to disturb either of the trial court rulings at issue in these consolidated appeals.

Affirmed.

FOR THE COURT:

Associate Justice