VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.     26-AP-060



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JUNE TERM,   2026

In re W.M., Juvenile
(C.M., Mother*)

}
}
}
}
}
}

APPEALED FROM:

Superior Court, Rutland Unit,
Family Division
CASE NO. 22-JV-01037
Trial Judge: Alexander N. Burke

In the above-entitled cause, the Clerk will enter:

Mother appeals the termination of her parental rights to W.M.  We affirm.

W.M. was born in July 2022.  On the day of her birth, the State filed a petition alleging that W.M. was a child in need of care or supervision (CHINS) because mother had untreated schizophrenia, exhibited delusions, made statements during her pregnancy suggesting she might harm the baby, and had not engaged in prenatal care.[*]  The family division issued emergency and temporary care orders transferring custody of W.M. to the Department for Children and Families (DCF).  In December 2022, the court found that W.M. was CHINS because mother's untreated mental health and lack of prenatal care placed her at risk of harm.

In February 2023, the court issued a disposition order with a goal of reunification with mother.  The case plan adopted by the court required mother to: engage in mental-health treatment, take medications as prescribed, and demonstrate stable mental health and the ability to care for herself; engage in Family Time Coaching through Easterseals and demonstrate that she could be a safe and protective caregiver for W.M.; sign all releases necessary for DCF; attend W.M.'s medical appointments; maintain safe and appropriate housing; and attend a DCF-approved parenting class.  The initial case plan called for mother to achieve these goals by July 2023.

The permanency goal date was extended by the court several times.  In January 2025, the child's attorney filed a petition to terminate mother's parental rights.  DCF arranged for mother

---

[*]   The petition also alleged that W.M.'s father was violent towards mother and was actively using crack cocaine.  Father did not participate in the case or appear at any hearings. The court terminated his parental rights in January 2026, and he did not appeal.

to undergo a mental examination, which took place in August 2025. After the psychologist's report was filed in November 2025, DCF joined in the termination petition.

The court held a final hearing in January 2026, which mother did not attend. After hearing evidence from the DCF caseworker and W.M.'s foster mother, the court made the following oral findings by clear and convincing evidence. Mother has schizophrenia, which can be addressed through medication. At the outset of the case, she worked well with DCF. She engaged in mental-health treatment and would show up early to visits with W.M. However, she needed significant support during visits. She required prompting to meet W.M.'s needs including checking and changing diapers, washing her hands afterward, and feeding W.M. appropriately. Despite receiving long-term support from Easterseals, she demonstrated little to no improvement in her ability to properly care for W.M.

Mother had difficulty maintaining housing. Her landlord threatened eviction because her apartment was dirty. Instead of contesting the eviction, mother left the apartment. In 2024, mother stopped taking her medications and was eventually hospitalized at Rutland Regional Medical Center. After her condition stabilized, she was discharged to a voluntary housing program run by Rutland Mental Health. The program had in-home mental health support, and monitored and dispensed mother's medications. Mother left the program and went to live with a man named Vincent or Vinny in Cornwall. This concerned DCF because mother's medications were at Rutland Mental Health. Mother later reengaged with mental-health services through a program in Vergennes, and her mental health appeared to improve for a time. This period of stability ended when Vinny died and mother was no longer able to live in his home. At the time of the hearing, she was living in Winooski, although she had not provided her address to DCF. DCF had not had any contact with mother since August 2025, when the caseworker transported mother to her psychological evaluation. This was also the last time mother saw W.M.

There was no evidence that mother was currently engaged in mental-health treatment, and she had not signed releases for DCF to confirm her treatment. Mother's housing situation was unknown. She never attended a parenting class. DCF and the foster mother kept mother informed about W.M.'s medical appointments and the foster mother provided transportation when mother requested it, but mother had not attended any medical appointments since 2022.

The court found that mother had stagnated in her progress toward reunification and that her stagnation was due in part to factors within her control. It found that when mother was unmedicated, her reasoning was insufficient to be able to decide whether to reengage with medications. But even when her mental health was relatively stable after her hospitalization, she chose to leave the supportive housing program to go live with Vinny. Earlier in the case, her ability to parent W.M. never improved even when she was on medication and receiving coaching. The court rejected mother's argument that the court should deny the petition because DCF failed to adequately accommodate mother's mental illness in violation of the Americans with Disabilities Act (ADA), reasoning that denial of a termination petition was not an appropriate remedy for an ADA violation and the focus of the proceeding was on the best interests of the child.

The court then assessed the best-interests factors. It found that W.M. was closely bonded to her foster family, daycare, and community. She had not had contact with mother since June of 2025, except during the psychological evaluation in August 2025. Mother was unlikely to be able to resume parental duties within a reasonable time due to her absence from W.M.'s life.

2

The court therefore concluded that termination of mother's parental rights was in W.M.'s best interests. This appeal followed.

When considering a petition to terminate parental rights after initial disposition, the family court must first determine whether there has been a change in circumstances sufficient to justify modification of the original disposition order. In re B.W., 162 Vt. 287, 291 (1994). "A change in circumstances is most often found when the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." In re H.A., 153 Vt. 504, 515 (1990). If it finds a change in circumstances, the court must then consider whether termination is in the child's best interests in accordance with the factors set forth in 33 V.S.A. § 5114(a). "The most important factor for the court to consider is the likelihood that the parent will be able to resume parental duties within a reasonable time." In re J.B., 167 Vt. 637, 639 (1998). "As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450.

On appeal, mother's sole argument is that DCF provided insufficient services to ensure mother took her medication and therefore did not meet its burden of demonstrating that she would not be able to resume parenting within a reasonable time. Mother acknowledges that a parent may not raise alleged violations of the ADA as a defense to a termination proceeding. In re B.S., 166 Vt. 345, 354 (1997). Instead, she argues that nonadherence to medication therapy is a known risk in individuals with schizophrenia, and that DCF was obliged to address this risk in its case planning. Mother contends that DCF failed to actively advocate for her or provide solutions such as suggesting long-acting injectable medications. Mother argues that DCF's failure to ensure that mother took her medications doomed any reunification effort from the start.

"Although a court is not required to find that [DCF] made reasonable efforts to assist a parent, such assistance is a factor in determining whether [DCF] met its burden of showing that a parent is unlikely to be able to resume parental duties within a reasonable period." In re J.M., 170 Vt. 587, 589 (2000) (mem.). Here, the court's findings regarding the services offered to mother support its conclusion that mother was unable to assume parental duties for W.M. within a reasonable time. Mother received extensive services from the outset of the case until at least 2024. She was engaged in mental-health treatment and took her medications for a significant portion of this time. Despite being compliant with her medications and receiving extended parental coaching services, her parenting skills did not meaningfully improve. She required prompting for basic caregiving tasks, such as checking W.M.'s diaper, changing it when needed, and washing her own hands afterward. Her inability to manage these basic needs posed a safety risk to W.M. After her hospitalization in 2024, she had the opportunity to live in supportive housing, where she received in-home treatment and medication monitoring. She chose to leave that environment, jeopardizing her own progress. These findings support the court's determination that even if mother was compliant with her prescribed medication, she could not resume parenting W.M. within a reasonable time, because she was not able to provide him with safe caregiving or prioritize the stability of her own mental health. The findings also demonstrate that mother's lack of progress was attributable to factors within her control, rather than DCF's failure to provide services. See In re S.R., 157 Vt. 417, 421-22 (1991) (rejecting argument that stagnation caused by factors beyond parents' control where parents were offered services and did not make progress). To the extent mother objects to the specific requirements of the case plan adopted by the court in its initial disposition order, which mother did not appeal, our law is clear that such collateral attacks are barred. Cf. In re K.G., 2023 VT 51, ¶ 42, 218 Vt.

419 (holding parents could not collaterally attack emergency care order or CHINS merits decision where they failed to appeal initial disposition order).

The record supports the court's determination that there was a change in circumstances sufficient to justify modifying the existing disposition order and its assessment of the best-interests factors. We therefore see no reason to disturb the decision below.

Affirmed.

BY THE COURT:

_____
Nancy J. Waples, Associate Justice

_____
Christina E. Nolan, Associate Justice

_____
Michael P. Drescher, Associate Justice

4