VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.        23-AP-117

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

OCTOBER TERM,   2023

In re K.H., K.H., K.D., Juveniles
(T.H., Father\* & K.D., Mother\*)

} APPEALED FROM:
}
} Superior Court, Franklin Unit;
} Family Division
} CASE NOS. 39-2-20 Frjv; 40-2-20 Frjv &
           41-2-20 Frjv
Trial Judge: Mary L. Morrissey

In the above-entitled cause, the Clerk will enter:

Mother appeals from the termination of her parental rights in K.D., born in 2011, Kay.H., born in 2013, and Kav.H., born in 2017. Father of Kay.H. and Kav.H. appeals from the termination of his parental rights.[\*] We affirm.

### I.  Proceedings Below

The record indicates the following. The Department for Children and Families (DCF) has been involved with this family since 2011; it opened multiple family support cases. In late February 2020, the State filed a petition alleging that the children were in need of care or supervision (CHINS) due to concerns about substance abuse, mental-health issues, and lack of supervision. The children were immediately placed in DCF custody where they remain. The children were adjudicated CHINS in October 2020 following a contested merits hearing. The court found that mother consistently failed to follow through in addressing various risk factors and that the children were at significant risk of harm based on a lack of supervision, exposure to parents' tumultuous relationship, significant school absences and parents' inability to ensure regular attendance, and a general failure to follow through with offered services.

Between September 2020 and April 2021, mother was involved in a relationship with D.B. D.B. physically and emotionally abused mother, including choking mother to the point of unconsciousness and threatening to kill mother and the children. Mother reported that D.B. forced her to use drugs with him and injected substances into her neck. In April 2021, D.B. was arrested and charged with second-degree aggravated domestic assault against mother in addition

---

[\*] K.D.'s father's parental rights were not addressed in the order on appeal. We use the term "father" in this appeal to refer to the father of Kay.H. and Kav.H.

to other charges. He was held without bail and incarcerated; he later pled guilty. Mother and D.B. remained in contact during D.B.'s incarceration.

In April 2021, mother participated in inpatient substance-abuse treatment. At that time, mother reported drinking every day and experiencing withdrawal symptoms in the morning; she was unable to reduce her alcohol consumption. While mother successfully completed the treatment program, she was charged with driving under the influence of drugs shortly after her discharge. Mother resumed her relationship with D.B. following his release from jail in July 2021. D.B. was reincarcerated in the Fall of 2021.

A disposition hearing occurred in December 2021, and the court adopted case plans calling for reunification of the children with a parent by March 2022. The case plans contained numerous goals for each parent.

In March 2022, the State moved to terminate parents' rights. Following several days of hearings in October and November 2022, as well as February 2023, the court granted the State's request in a March 2023 order. It concluded that both parents had stagnated in their ability to parent and that termination of their rights was in the children's best interests.

The court made numerous findings, including the following. Father struggled from the beginning to meet the case plan expectations. He has schizophrenia and mental-health issues. Father did not take steps to address his mental health and did not engage in an updated substance use assessment. In May 2022, father was arrested on new criminal charges, and he has remained in the custody of the Department of Corrections (DOC) since that time. At the time of his arrest, father had not remained substance free; he had not established a safe network of people; he did not attend shared parenting meetings or school meetings for the children; he did not obtain safe and stable housing; and he did not maintain a stable source of income. Father had never acted in a caregiving role for Kay.H. or Kav.H. and, by the time of the termination hearing, the children had no contact with father for over two years.

Mother continued to struggle with substance-use issues. In March 2022, DCF learned that mother was involved in an accident while under the influence of alcohol and she left the scene. The court found mother's consumption of alcohol posed additional risks as mother was taking methadone, and the combination of these substances could be lethal. Mother's urine samples were positive for alcohol through June 2022; based on her observations, the DCF case worker questioned mother's sobriety after that date as well. Mother's scheduled contacts with the children were cancelled at least twice due to mother's presentation.

Mother stayed at a domestic-violence shelter in the fall of 2021, but she remained in contact with D.B. during this time. Mother was asked to leave the shelter because she was smoking inside and sneaking unauthorized people into the shelter. In the spring of 2022, mother moved into a four-bedroom apartment. While the apartment had space for the children, questions remained about whether mother could keep the home safe from violence. Mother had a boyfriend who threw a television on mother's foot, injuring her. Mother also recounted that a woman she knew broke into the apartment and stole mother's medications. Mother struggled to create a safe and supportive network of individuals on whom she could rely and who would remain substance free.

As referenced above, mother was in a relationship with D.B. who physically assaulted her, threatened her and her family members, and engaged in controlling behaviors. DCF discussed with mother how attending visitation with bruising and black eyes affected the

2

children; it caused the children to worry about mother and distrust male father figures. While mother indicated that she understood and wanted to discontinue the pattern, she struggled to do so. Mother was dishonest about her communications with D.B. until confronted with call logs provided by DOC. The court recognized that mother's behavior was not atypical for domestic-violence survivors and credited mother for acknowledging that her prior situation had a negative impact on the children. Mother struggled, however, to integrate into her life the education she had received relative to domestic violence in her ongoing relationships, which created risks to the children. Specifically, the court found, children who are exposed to domestic violence can suffer from anxiety, adverse childhood reactions, and post-traumatic stress disorder, and can grow up to have unhealthy relationships, be fearful of the individual perpetrating the abuse, struggle in school, and have difficulty maintaining healthy connections. Consequently, the court found, mother's continued involvement with individuals who had "red flags" for domestic violence and who perpetrated violence raised significant concerns for the children's well-being.

Mother was currently involved with a man who had a criminal history. While mother denied the relationship, the man had been seen picking up mother from her visits with the children. DCF had informed mother that it did not view this man as a safe support for mother.

Mother's current diagnoses included post-traumatic stress disorder-complex, attention deficit hyperactivity disorder, and severe opioid-use disorder. Mother's therapist believed that mother was presently in early remission for alcohol-use disorder. While mother engaged in counseling, her counselor relied heavily on mother's self-reporting of any substance or alcohol use. Mother's therapist was retiring, and mother would need to find another therapist.

Mother engaged in Family Time Coaching (FTC) for two years although the program typically lasts one year. Mother's "needs" list, which identified targeted goals, had not changed in the two years that mother was engaged in FTC. The court made extensive findings on mother's behavior during contact with the children, which we do not repeat here. Among other things, mother struggled to focus on more than one child, engaged in inappropriate talk with the children, struggled to understand each child's developmental needs, and struggled with timeliness and attendance at FTC. She failed to make sustained progress and implement what she learned.

The children had various foster placements, but their placements became more stabilized after July 2021. Kay.H. was doing well in his current foster home and had made progress there. Kay.H. became more scattered, dysregulated, and he talked back more following contacts with mother. Kay.H. reported a chaotic home environment while he was in mother's custody. Mother and father frequently argued, and father drank a lot; the family slept in the same bed and mother had sex in the bed while Kay.H. was there.

K.D. and Kav.H. also made progress in their foster placements. Kav.H. had to move from her foster home during the pendency of the termination proceedings because her foster parents lost their foster license. As a result, the court reopened the evidence and held an additional hearing in February 2023 limited solely to any changed circumstances with respect to Kav.H. The court made findings on post-termination hearing events as they affected Kav.H. Among other things, the court found that mother had resumed her relationship with D.B. and that he was spending time in her home; mother was not engaged in mental health counseling; she missed multiple contacts with Kav.H.; she continued to struggle with alcohol use; and she missed a series of meetings with her DCF case worker.

3

Based on these and numerous other findings, the court concluded that parents' lack of progress constituted a substantial change in circumstances that warranted modification of the existing disposition order. The court explained that, at the time of disposition in December 2021, permanency for Kay.H. and Kav.H. was premised on the ability of parents to assume parental responsibilities for them by March 2022; permanency for K.D. was premised on mother or her father assuming parental responsibilities for her by the same date. Mother struggled to meet the case plan expectations and father had not fulfilled any of the expectations. The children had been in custody since February 2020, and parents had made little progress in their parenting ability since that time. The court concluded that parents' progress had stagnated.

More specifically, the court expressed concern about mother's ability to sustain long-term sobriety, particularly given the length of time that she had struggled with substance use. Mother also struggled to maintain her personal safety in the course of her interpersonal relationships. Mother continued her relationship with D.B. even though she had worked with multiple resources to gain education about domestic violence. She was dishonest with DCF about her continued contact with D.B. and she was not candid with her therapist about the contact even though her therapist was specifically trying to help mother with her past trauma from D.B. and to set limits with men. The court found that mother's lack of honesty and candor was inconsistent with the case plan expectation that mother discontinue contact with D.B. and access supports so that she could be "free of violent and unsafe relationships." The court added that D.B. had been released from jail before the termination hearing, which added to its concern. As indicated above, the safety and security of mother's present home was also uncertain given mother's struggles to maintain her own safety within her personal relationships. Mother also failed to make progress in FTC or appreciate the children's needs. As a result, her contact with the children had not expanded. K.D. was willing to have only limited visits with mother and even those contacts had issues.

Father had no contact with Kay.H. in more than two years and father had never acted in a caregiving role for him. The court found no evidence that father met any of the case-plan expectations, and prior to his May 2022 incarceration, father continued to struggle with significant illicit substance abuse. Father remained incarcerated at the time of the court's decision, and it was unclear when he might be eligible for release.

The court made separate findings as to Kav.H., which largely mirrored those set forth above. Mother missed contacts with Kav.H. and arrived late to others. This created uncertainty for Kav.H. as to whether contact would occur. Mother's interactions with Kav.H. were also impacted by mother's lack of engagement with Kav.H. during FTC sessions, leading to questions about mother's sobriety. Mother's contact with Kav.H. had not progressed beyond one unsupervised contact and two supervised contacts each week in FTC during which mother could not consistently meet any of the goals established two years earlier. Kav.H. had not had any contact with father in over two years, and he had never acted in a caregiving role for her.

Turning to the statutory best-interests factors, the court concluded that they supported termination of parents' rights. As to the most important factor, it concluded that neither parent could resume their parental duties within a reasonable time. It recounted parents' lack of progress referenced above. It emphasized that the children had been in DCF custody since February 2020 and they needed long-term stability, neither of which parents could provide. The court thus terminated parents' rights. Mother and father appealed.

## II. Arguments on Appeal

### A. Standard of Review

We begin with our standard of review. When termination is sought after initial disposition through modification of a prior order, the court must conduct a two-step analysis. It must first consider if "there has been a substantial change in material circumstances," and, if so, whether "termination of parental rights is in [a] child's best interests." In re K.F., 2004 VT 40, ¶ 8, 176 Vt. 636 (mem.). As long as the court applied the proper standard, we will not disturb its findings on appeal unless they are clearly erroneous; we will affirm its conclusions if they are supported by the findings. In re G.S., 153 Vt. 651, 652 (1990) (mem.). "Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating . . . parental rights." In re S.B., 174 Vt. 427, 429 (2002) (mem.).

### B. Father's Arguments

Father argues that the court erred in finding that he was unable to parent Kay.H. and Kav.H. within a reasonable time. In support of this assertion, father states that Kav.H. missed him and expressed a consistent desire to see him. Father maintains that it would be to Kav.H.'s advantage to have a relationship with father and the court should have fashioned a remedy that would have allowed for the preservation of the family unit in an alternative form.

We find no error. The court applied the appropriate standard in evaluating the State's petition, and its decision is supported by the evidence. Father does not challenge any of the court's findings with respect to stagnation and the statutory best-interests criteria and the findings amply support the court's conclusions. Father had not seen the children in two years at the time of the termination hearing and had never acted in a caregiving role for them. He failed to make any progress on the case plan expectations and was incarcerated. The fact that Kay.H. may have expressed missing father, which the court found occurred at times of emotional fragility, does not undermine any of the court's conclusions. Cf. In re M.B., 162 Vt. 229, 238 (1994) (recognizing that "[p]ublic policy . . . does not dictate that the parent-child bond be maintained regardless of the cost to the child"). It is not clear what alternate custody arrangement father advocates, and there is no showing that this argument was raised below. In any event, we have stated on numerous occasions that "once the family court applies the [statutory best-interests] criteria . . . and determines that the child's best interests warrant giving the State custody of the child without limitation as to adoption, the court need not revisit the permanency hearing options contained in 33 V.S.A. § [5318] and explain why it is choosing termination of parental rights over other options enumerated therein." In re T.T., 2005 VT 30, ¶ 7, 178 Vt. 496. Father's claims of error are without merit.

### C. Mother's Arguments

We thus turn to mother's challenges. Mother first asserts that the court erred in concluding that she stagnated in her ability to parent the children. Mother contends that her occasional use of illicit substances does not support the court's conclusion. According to mother, she made substantial progress in addressing the issues that led to DCF intervention. Mother argues that she was penalized for being a victim of domestic violence.

We reject these arguments. Changed circumstances are "most often found when the parent's ability to care properly for the child has either stagnated or deteriorated over the passage

5

of time." In re B.W., 162 Vt. 287, 291 (1994) (quotation omitted). "Stagnation may be shown by the passage of time with no improvement in parental capacity to care properly for the child." Id. (quotation omitted). "[T]he mere fact that a parent has shown some progress in some aspects of his or her life does not preclude a finding of changed circumstances warranting modification of a previous disposition order." Id. (quotation omitted).

The court's findings amply support its conclusion that mother stagnated in her ability to parent the children. The case plan set forth numerous expectations for mother, with the ultimate goals of addressing her mental health, physical health, and substance use, as well as demonstrating an ability to meet her own needs while simultaneously providing adequate supervision and routine for the children to ensure that their basic needs were met. Mother struggled to maintain her sobriety despite attending counseling and participating in medication assisted treatment, and the court remained concerned about her ability to maintain long-term sobriety. Mother also struggled to maintain her personal safety in the course of her interpersonal relationships; it was not clear that she could provide the children with a safe and secure home; and she failed to make progress in FTC and her visitation with the children over the course of several years. As to Kav.H., the evidence also showed that mother continued to struggle with maintaining her sobriety, she resumed her contact with D.B., she failed to obtain a new mental-health counselor, and she was not engaged in mental-health counseling. To the extent that mother argues that the court erred in weighing the evidence, we reject that argument. It is the exclusive role of the trial court, as the factfinder, to weigh the evidence and assess the credibility of witnesses. See In re A.F., 160 Vt. 175, 178 (1993).

We further reject mother's suggestion that she should not have been expected to maintain sobriety. The case plan goals were clear. Mother has long struggled with substance use, and she was expected, among other things, to provide urine samples as requested that were positive only for prescribed substances. She failed to do so. This case is not like In re T.M., 2016 VT 23, 201 Vt. 358, cited by mother. In In re T.M., the trial court concluded that a father had stagnated in his ability to parent based solely on his intermittent use of marijuana and alcohol. We reversed, finding no evidence connecting his use of these substances to his ability to parent. Id. at ¶¶ 21-22. Unlike In re T.M., the court's stagnation conclusion here was not based solely on mother's failure to maintain sobriety; it rested on mother's failure to meet numerous case plan expectations, including addressing her substance-use issues. Additionally, the evidence amply shows the risks created by mother's substance use, including car accidents and an inability to participate fully or at all in visits with the children.

The court did not penalize mother for being a victim of domestic violence, as mother asserts. The court appropriately focused on the risk that mother's choice of violent partners posed to the children. It did not need to find that the children witnessed D.B.'s abuse of mother. The court detailed the harm caused to the children when they saw mother with black eyes and bruising during visitation. Cf. In re A.O., 2023 VT 54, ¶ 13 (reversing CHINS merits decision that rested solely on risk of harm to children due to exposure to domestic violence where trial court's "decision rested largely on its general and nonspecific finding that witnessing domestic violence harms children"). It found that, despite understanding the harm and acknowledging it, mother continued to struggle to make changes that would protect the children should they be returned to her care. It did not err in concluding that mother's continued involvement with individuals who had "red flags" for domestic violence and who perpetrated violence raised significant concerns for the children's well-being.

Mother next asserts that the court erred in evaluating the evidence with respect to each of the statutory best-interests factors. All of her arguments challenge the court's assessment of the weight of the evidence and the credibility of witnesses, matters reserved solely for the trial court. See In re A.F., 160 Vt. at 178. We do not reweigh the evidence on appeal. The record does not support mother's assertion that she was penalized for her economic circumstances. Nor does it support mother's assertion that the court applied the wrong standard in evaluating her ability to resume parenting within a reasonable time. As we have recognized, "[t]he reasonableness of the time period is measured from the perspective of the child's needs," and the court may consider the "age of the children, the length of time that they had been separated from their parents, and their need for stability and permanence." In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29; In re J.S., 168 Vt. 572, 574 (1998). The court here considered the amount of time the children had been in custody, mother's failure to make sufficient progress during that time, and the children's need for stability and permanency. Its inquiry was "forward-looking," and supported by the evidence. In re D.S., 2014 VT 38, ¶ 21-22, 196 Vt. 325 (recognizing that court must consider a parent's "prospective ability to parent the child," and "[o]f course, past events are relevant in this analysis" (quotation omitted)).

Finally, mother argues that the juveniles' attorney had a conflict of interest because the children expressed contrary positions and the attorney failed to represent those interests. Mother appears to refer to a statement by the juveniles' counsel in hearings concerning a conditional-custody order in May 2022 that the children wanted increased parent-child contact and "want very much to be reunited with their mother." These hearings predated the termination proceedings, and the denial of a conditional-custody order is not on appeal. Mother appears to suggest that this statement is contrary to the juveniles' attorney's statement during the termination proceedings that, given the children's age, the position taken by the guardian ad litem as to the children's interests was highly controlling. Mother then complains that the attorney took no position at the conclusion of the termination hearing. Mother did not raise these arguments below. She nonetheless maintains that she has standing to raise this issue on appeal because of the fundamental interests at stake in the termination proceeding and her shared interest with the children.

We do not address this argument because mother failed to preserve it. See Bull v. Pinkham Eng'g Assocs., 170 Vt. 450, 459 (2000) ("Contentions not raised or fairly presented to the trial court are not preserved for appeal."). The record shows that, during the first day of the TPR proceedings, counsel for the State raised the possibility that a conflict might exist for the juveniles' attorney. The juveniles' attorney disagreed that any actual conflict existed. The court stated that it saw no conflict in the evidence. The court asked if any of the other attorneys perceived a conflict, including mother's attorney. Mother's attorney responded that she had no "reason at this point to question [the juveniles' attorney's] ability to represent the interests of all three children." After questioning the juveniles' attorney again, the court found that no conflict existed, and the proceedings continued. In light of this record, we do not address mother's attempt to challenge the court's ruling for the first time on appeal.

To the extent that mother raises a claim of plain error, we reject it. "[P]lain error is found only in a rare and extraordinary case where the error is an obvious one and so grave and serious as to strike at the very heart of a [party's] constitutional rights." In re H.T., 2020 VT 3, ¶ 18, 211 Vt. 476 (quotation omitted). Mother fails to make the necessary showing here. We have recognized that "one attorney may represent more than one child in a juvenile proceeding and will not be disqualified unless an actual conflict arises." In re L.H., 2018 VT 4, ¶ 35 n.9, 206 Vt. 596 (emphasis added). " 'An actual conflict exists when an attorney's professional judgment for

one client necessarily will be affected adversely because of the interests of another client.' " <u>In re Jasmine S.</u>, 163 Cal. Rptr. 3d 593, 601 n. 6 (Ct. App. 2007) (quoting 2 R. Mallen & J. Smith, Legal Malpractice § 16:2, at 818 (2007 ed.)). "If competent evidence does not establish such a conflict, the attorney is not disqualified for a conflict." <u>Id</u>. at 600. Mother has not identified any compelling evidence to show that an actual conflict existed here.

<u>Affirmed</u>.

BY THE COURT:

_____
Harold E. Eaton, Jr., Associate Justice


_____
Karen R. Carroll, Associate Justice


_____
Nancy J. Waples, Associate Justice

8